Armando Soliz DAVILA, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–94–00371–CR.

Court of Appeals of Texas,
El Paso.

July 3, 1996.

Rehearing Overruled Sept. 18, 1996.

642

M. Clara Hernandez, El Paso County Public Defender, El Paso, for appellant.

Jaime E. Esparza, District Attorney, El Paso, for the State.

Before BARAJAS, C.J., and LARSEN and McCLURE, JJ.

## OPINION

McCLURE, Justice.

Armando Soliz Davila ("Davila") was convicted of possession of less than 28 grams of cocaine and was sentenced to 99 years confinement in the Institutional Division of the Texas Department of Criminal Justice.[1] We affirm.

### SUMMARY OF THE EVIDENCE

On March 2, 1994, El Paso police officers Gilbert Cordova ("Cordova") and Robert Rodriguez ("Rodriguez") were dispatched to 420 South Virginia in response to a burglary call. The Alameda Housing Project is located at this address, and it is known to be a high drug use area. Upon arriving, the officers circled the housing project on foot and saw Davila sitting on a concrete slab next to the laundry room. As they moved closer, they observed that Davila was holding a syringe. Rodriguez testified that he saw Davila injecting the syringe into his right hand and later observed a stream of blood on that hand. The officers instructed Davila to drop the syringe, turn around, and place his hands on the wall. Cordova testified that Davila dropped the syringe, said, "Oh, hell" in Spanish, and complied with the officer's request without resistance. About six to twelve inches away from Davila, the officers spotted a small cut-out of a plastic baggie containing a white, powdery substance which proved to be cocaine. It is undisputed that the baggie

was not on Davila's person, nor did he attempt to retrieve it or make any sort of movement toward it prior to his apprehension.

After he was placed under arrest and given his *Miranda* warnings, Davila told the officers that "he finished shooting up and that it was cocaine." The officers placed the syringe and the baggie of cocaine into evidence bags. Cordova testified that cocaine cannot be injected in its powdered form and must be dissolved in liquid. Although bottle tops and spoons are frequently used by drug users for this purpose, neither of these items were found at the scene. Cordova did testify that water faucets were available in the area. Finally, the officers testified that no other person was around Davila as they approached and that they observed no one departing the scene.

### SUFFICIENCY OF THE EVIDENCE

In Points of Error Nos. Six and Seven, Davila asserts that the evidence was both legally and factually insufficient to support the jury's verdict.

#### Legal Sufficiency

In reviewing the legal sufficiency of the evidence to support a criminal conviction, we must review all the evidence, both state and defense, in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *Geesa v. State,* 820 S.W.2d 154, 159 (Tex.Crim.App.1991). We do not resolve any conflict of fact or assign credibility to the witnesses, as it was the function of the trier of fact to do so. *See Adelman v. State,* 828 S.W.2d 418, 421 (Tex.Crim.App.1992); *Matson v. State,* 819 S.W.2d 839, 843 (Tex.Crim.App.1991). Instead, an appellate court's duty is only to determine if both the explicit and implicit findings of the trier of fact are

---

1. The actual amount of cocaine which Davila was found to possess was seven milligrams. We note in her dissent to *Jenkins v. State,* 870 S.W.2d 626 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd), Justice O'Connor referenced testimony by a chemist that .33 milligrams of cocaine would appear in size to be about two grains of sugar. Assuming that to be true, the cocaine recovered in this instance would equate to roughly 42 grains of sugar.

rational by viewing all of the evidence admitted at trial in a light most favorable to the verdict. *Adelman*, 828 S.W.2d at 422. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. *Matson*, 819 S.W.2d at 843.

 Unlawful possession of a controlled substance contains two elements. The State must prove (1) that the accused exercised care, control, and management over the contraband, and (2) that the accused knew the substance being possessed was contraband. *See Martin v. State*, 753 S.W.2d 384, 386 (Tex.Crim.App.1988); *Menchaca v. State*, 901 S.W.2d 640, 651 (Tex.App.—El Paso 1995, pet. ref'd); *Musick v. State*, 862 S.W.2d 794, 804 (Tex.App.—El Paso 1993, pet. ref'd). An affirmative link must be established between the accused and the contraband demonstrating both that the accused had control over it and that the accused had knowledge of its existence and character. *See Brown v. State*, 911 S.W.2d 744 (Tex.Crim.App.1995); *Menchaca*, 901 S.W.2d at 651. This "affirmative link" may be shown by either direct or circumstantial evidence, and "it must establish, to the requisite level of confidence, that the accused's connection with the drug was more than just fortuitous." *Brown*, 911 S.W.2d at 747.[2]

 When the contraband is not found on the accused's person or it is not in the exclusive possession of the accused, additional facts and circumstances must link the accused to the contraband. *Menchaca*, 901 S.W.2d at 651; *Musick*, 862 S.W.2d at 804. These additional facts include any statements made by the accused, the proximity of the accused to the contraband and its accessibility or visibility to the accused, other people in the vicinity of the scene, and any indications of drug use by the accused such as the existence of drug paraphernalia and the presence of track marks on the accused. *See, e.g., Francis v. State*, 877 S.W.2d 441, 443 (Tex.App.—Austin 1994, pet. ref'd) (holding that appellant's confession to smoking five rocks of cocaine was sufficient to link appellant to the contraband); *Lavigne v. State*, 782 S.W.2d 253, 256 (Tex.App.—Houston [14th Dist.] 1989), *aff'd*, 803 S.W.2d 302 (Tex. Crim.App.1990) (holding that accused's statement that she had injected cocaine in conjunction with a fresh needle mark on her arm was sufficient to link her to the cocaine).

Davila's argument rests primarily on *Humason* and the application of the "outstanding reasonable hypothesis" test to the "affirmative links" analysis. The evidence adduced at trial demonstrates that the area where Davila was apprehended is open to public use and is known for high drug use. Despite the fact that Davila told the police that he had just injected himself with cocaine, he was not required to take urine or blood tests to establish whether his system contained cocaine. Finally, the syringe retrieved from Davila was not tested for trace amounts of cocaine.[3] Combining this evidence with the remaining evidence at trial, Davila asserts that the jury could have concluded that the cocaine had been dropped by someone other than Davila, especially in light of the fact that Davila

2. In *Brown*, the Court of Criminal Appeals held that while precedent, notably *Humason v. State*, 728 S.W.2d 363, 366 (Tex.Crim.App.1987), invoked the "outstanding reasonable hypothesis" standard in connection with a search for evidence linking the accused to illegal drugs, those cases no longer controlled because the "outstanding reasonable hypothesis" construct was abandoned in *Geesa*, 820 S.W.2d at 154. Instead, the ultimate consequence is that a defendant must be affirmatively linked with the drugs he allegedly possessed, but this link need not be so strong that it excludes every other outstanding reasonable hypothesis except the defendant's guilt. In short, *Brown* overruled the extension of the "outstanding reasonable hypothesis" construct to the "affirmative links" analysis as espoused in *Humason*. As noted by the concurring opinion, *Geesa* had no effect on the affirmative links doctrine because the affirmative link doctrine stands independent of the outstanding reasonable hypothesis analytical construct of appellate review rejected in *Geesa*. *Brown*, 911 S.W.2d at 749 (Baird, J. concurring).

3. The syringe was empty when the officers obtained it. They testified that it was not appropriate procedure to send empty syringes to the lab for testing. John Rudd, the chemist on the case, testified that he would not test syringes because of the danger of contracting AIDS. He testified further that if syringes had any substance in them, the officers had to remove it and place it in another container before lab technicians would run tests on it.

made no motion toward the baggie, did not attempt to flee from the officers, and otherwise complied with their instructions. In addition, the State offered no direct proof that the substance injected into Davila's hand was cocaine. He asserts that the jury may have found that the substance was insulin, or some other legal substance.

■ However reasonable the alternate hypothesis may be, this form of analysis is not the appropriate test. It was rejected by the Court of Criminal Appeals because its methodology proved "confusing and unworkable as an appellate standard." *Brown*, 911 S.W.2d at 746. In practice, the rule did not differ greatly from the traditional legal sufficiency review under *Jackson*. *Id.* Thus, we are duty bound to view all the evidence in the light most favorable to the verdict. If a rational trier of fact could find the essential elements of the offense beyond a reasonable doubt, we must affirm the verdict. The evidence demonstrates that Davila was injecting a syringe into his right hand, that he later told the officers that the syringe contained cocaine, and that the baggie of cocaine was within Davila's reach. From this evidence, a rational trier of fact could find beyond a reasonable doubt that Davila had control over a substance he knew to be cocaine. Therefore, Davila's Point of Error No. Six is overruled.

### *Factual Sufficiency*

■ The Court of Criminal Appeals recently decided that a non-capital defendant has a right to appellate review of factual sufficiency of the elements of the offense. *Clewis v. State*, 922 S.W.2d 126 (Tex.Crim. App.1996). In reviewing factual sufficiency, this Court considers all of the evidence, but does not view it in the light most favorable to the verdict. *Clewis*, 922 S.W.2d at 128–29. We will set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* The Court of Criminal Appeals noted in *Clewis* that Texas courts have articulated the standard for factual sufficiency review in various ways. *Clewis*, 922 S.W.2d at 134 n. 16. The standard stated in *Clewis*, and that generally followed by this Court, are, as applied,

identical. *See id.* In the wake of *Clewis*, we have announced the analysis to be utilized in a factual sufficiency review of a criminal conviction. *Taylor v. State*, 921 S.W.2d 740 (Tex.App.—El Paso 1996, no pet.).

■ "Insufficient evidence" or factual insufficiency involves a finding that is so against the great weight and preponderance of the evidence as to be manifestly wrong. The test for factual insufficiency points is set forth in *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). In reviewing a point of error asserting that a finding is against the great weight and preponderance of the evidence, the appellate court must consider all of the evidence, both the evidence which tends to prove the existence of a vital fact as well as evidence which tends to disprove its existence. If the verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained. In other words, if there is sufficient competent evidence of probative force to support the finding, a factual sufficiency challenge cannot succeed. *Carrasco v. Goatcher*, 623 S.W.2d 769 (Tex.App.—El Paso 1981, no writ). This is true even if the finding is supported by no more than a scintilla of evidence and even though reasonable minds might differ as to the conclusions to be drawn from the evidence.

The realm of insufficient evidence exists in an area where there is some evidence of a fact in issue, sufficient that a jury question is warranted, but the evidence will not support a finding in favor of the proponent of that fact in issue. The parlance used by the courts of appeals is that such a finding "shocks the conscience" or that it is "manifestly unjust" limited by such phrases as "the jury's determination is usually regarded as conclusive when the evidence is conflicting," "we cannot substitute our conclusions for those of the jury," and "it is the province of the jury to pass on the weight or credibility of a witness's testimony." *See, e.g., Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 30 (Tex.1994); *Beall v. Ditmore*, 867 S.W.2d 791, 795 (Tex.App.—El Paso 1993, writ denied).

In conducting a factual sufficiency review, the reviewing court cannot substitute its conclusions for those of the jury. It is not within the province of this Court to interfere with the jury's resolution of conflicts in the evidence or to pass on the weight or credibility of the witness's testimony. *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792 (1951); *Reynolds v. Kessler*, 669 S.W.2d 801, 807 (Tex.App.—El Paso 1984, no writ). Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *Clark v. National Life & Accident Ins. Co.*, 145 Tex. 575, 200 S.W.2d 820, 821 (1947); *Oechsner v. Ameritrust Texas, N.A.*, 840 S.W.2d 131, 136 (Tex.App.—El Paso 1992, writ denied).

The verdict here is not so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. Davila presented no evidence other than that elicited through the cross-examination of the State's witnesses. While Davila asserts that the evidence may be viewed in ways that exonerate him of possessing the cocaine, the cumulative effect of these inferences do not so overwhelm the solid inference linking Davila to the cocaine such that justice demands a new trial. At most, Davila's arguments demonstrate that the inferences linking him to the cocaine could have been stronger. Other than the fact that the area was known for high drug use, none of the evidence adduced by Davila directly contradicts any of the State's affirmative links. As such, the evidence was factually sufficient to link Davila to the cocaine. Point of Error Seven is overruled.

### Preservation of Error

Although we have concluded that the evidence is factually sufficient to support the conviction, we pause to consider the State's argument that Davila failed to preserve his factual sufficiency claim. Noting that the standard applied in a factual sufficiency review derives from the civil arena, the State argues that all of the procedural niceties applicable to preserving the point in civil cases should apply here. Without question, in the civil context, a motion for new trial is required to preserve a challenge to the factual sufficiency of the evidence to support a jury finding.[4] TEX.R.CIV.P. 324(b)(2). This requirement has been applied in the quasi-criminal hybrid of juvenile proceedings. Although juveniles are prosecuted for criminal offenses, the Texas Family Code mandates that an appeal from an order of a juvenile court is to be predicated upon the civil standards. TEX.FAM.CODE ANN. § 56.01 (Vernon Supp.1995). As a result, we have previously determined that a juvenile who complains on appeal of the factual sufficiency of the evidence must preserve the complaint in a motion for new trial. *In the Matter of C.F. v. State*, 897 S.W.2d 464 (Tex.App.—El Paso 1995, no writ). Our holding is consistent with the directives of the Supreme Court. *In the Matter of M.R.*, 858 S.W.2d 365, 366 (Tex.1993).

We recognize, however, that not all procedural requirements for preservation of error are enumerated in the Rules of Civil Procedure, the Rules of Criminal Procedure or the Rules of Appellate Procedure. For example, when a criminal defendant challenges limitations on voir dire, two factors are relevant: (1) whether the defendant's voir dire examination reveals an attempt to prolong the voir dire by asking questions that were irrelevant, immaterial, or unnecessarily repetitious; and (2) whether the questions that the defendant was not permitted to ask members of the venire were proper voir dire questions. *Ratliff v. State*, 690 S.W.2d 597, 599 (Tex.Crim.App.1985); *Clark v. State*, 608 S.W.2d 667, 669–70 (Tex.Crim. App.1980); *De La Rosa v. State*, 414 S.W.2d 668, 670 (Tex.Crim.App.1967). These criminal requirements have been implemented in the civil arena. *See Dickson v. Burlington Northern Railroad*, 730 S.W.2d 82 (Tex. App.—Fort Worth 1987, writ ref'd n.r.e.) (court of appeals adopting preservation requirements of *Smith v. State*, 703 S.W.2d 641 (Tex.Crim.App.1985) and *De La Rosa*,

---

4. The civil procedural requirements for preservation of error differ in a jury and a non-jury trial. While a motion for new trial is a prerequisite to preserving a factual insufficiency complaint in a jury trial, it is not required to complain on appeal in a non-jury case that the evidence was legally or factually insufficient. TEX.R.APP.P. 52(d).

414 S.W.2d at 668). None of the rules specify these requirements; instead, the courts have judicially implemented methods of error preservation. Similarly, when a juror is the subject of a peremptory strike and a challenge is made that the juror was stricken for racial or gender-based purposes,[5] the challenging party must first make a prima facie showing of the State's discriminatory use of peremptory challenges; the burden then shifts to the State to give a neutral explanation for the preemptory challenges. The explanation must be clear and reasonably specific, and broad assertions that the prosecutor's reasons are not discriminatory or that the challenged venireperson would be biased in favor of defendant because of their common race or gender are not sufficient to rebut a prima facie case. *Emerson v. State*, 851 S.W.2d 269 (Tex.Crim.App.1993). In order to establish a prima facie case a defendant must show: (1) she is a member of a cognizable racial group; (2) the prosecutor exercised peremptory challenges to remove from the venire members of the defendant's race (relying on the principle that peremptory challenges constitute a jury selection practice which permits those to discriminate who are of a mind to discriminate); and (3) these facts and any other relevant circumstances raise an inference the prosecutor used the peremptory challenges to exclude the veniremembers on account of their race. *Salazar v. State*, 818 S.W.2d 405, 407 (Tex. Crim.App.1991); *Keeton v. State*, 724 S.W.2d 58, 65 (Tex.Crim.App.1987). Once *Batson* and its progeny were extended to civil litigation, the procedural requirements for preservation of error were adopted directly from the criminal law. Again, these procedural requirements are not the product of legislation or judicial rule making. They are created and implemented by *stare decisis*. Additionally, where a litigant complains of the trial court's refusal to challenge a juror for cause, error must be preserved. In order to preserve error in the criminal context, an appellant must: (1) use all of his peremptory strikes; (2) ask for and be refused additional peremptory strikes; and (3) be forced to take an identified objectionable juror whom appellant would not otherwise have accepted had the trial court granted his challenge for cause or granted him additional peremptory strikes. *Colella v. State*, 908 S.W.2d 437, 446 (Tex.Crim.App.1995); *Demouchette v. State*, 731 S.W.2d 75, 83 (Tex.Crim.App. 1986). These same requirements apply to civil matters. *Hallett v. Houston Northwest Medical Center*, 689 S.W.2d 888 (Tex.1985).

While we have no difficulty applying the requirements for preservation of error in a criminal proceeding to a civil proceeding in the absence of directives from the Supreme Court, the converse is not equally true. Due process dictates that should an impediment to a factual sufficiency analysis be imposed upon a criminal defendant, the procedures should be established by the Legislature or the Court of Criminal Appeals, either by rule amendment or affirmative case law. While the Court of Criminal Appeals has sanctioned factual sufficiency review in *Clewis*, it has not provided us with methods of implementation. The State suggests that *Clewis* itself clearly indicates that factual sufficiency must have been properly presented.[6] We interpret this language to mean that the factual sufficiency challenge must be raised by point of error in an appellant's brief. If the brief merely challenges the sufficiency of the evidence and references the appellate court to the *Jackson v. Virginia* standard while seeking a judgment of acquittal, only a legal sufficiency complaint has been preserved. *See, Munoz v. State*, No. 08–95–

---

5. Prohibitions against racially-based peremptory challenges in criminal cases were established in *Batson v. Kentucky*, 476 U.S. 79, 96, 106 S.Ct. 1712, 1723, 90 L.Ed.2d 69 (1986) and first applied to Texas criminal proceedings in *Keeton v. State*, 724 S.W.2d 58 (Tex.Crim.App.1987). *Batson* was applied to civil proceedings by the United States Supreme Court in *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) and by the Texas Supreme Court in *Powers v. Palacios*, 813 S.W.2d

489 (Tex.1991). *Batson* was expanded to prohibit gender-based peremptory challenges in *J.E.B. v. Alabama*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

6. Actually, the opinion states that after a court of appeals determines that the evidence is legally sufficient, "it may proceed further to review factual sufficiency *if it is properly raised*." [Emphasis added]. *Clewis*, 922 S.W.2d at 128–29.

00057–CR (Tex.App.—El Paso April 4, 1996, no pet. h.) (not designated for publication); *Martinets v. State*, 884 S.W.2d 185 (Tex. App.—Austin 1994, no pet.). While we are comfortable with a requirement that factual sufficiency be properly presented on appeal by assignment of error, that comfort level does not rise to the requirement that the factual sufficiency complaint have been pre-served by motion for new trial.[7] We invite the Court of Criminal Appeals to issue di-rectives for the implementation of *Clewis*.

## EVIDENTIARY CHALLENGES

### Reference to Parole Revocation Hearing

In Point of Error No. One, Davila asserts that the trial court erred in overruling his objection to two nonresponsive answers made by Cordova and in denying his motion for a mistrial. However, the thrust of the point of error is not that the statements were nonre-sponsive, as they in fact were, but that they included evidence of extraneous offenses. In an attempt to impeach Cordova's recount of the inculpatory statement made by Davila, Davila questioned Cordova about a prior in-consistent statement made during Davila's parole revocation hearing. Evidently, Cor-dova asserted at the prior hearing that Davi-la had made no statements when he was arrested. Cordova, however, attempted to explain the inconsistency by asserting that he had not read his report *prior to the parole revocation hearing*. The exchange between Davila's counsel and Cordova follows:

> [Davila's counsel]. Okay. Now, you re-member testifying on a previous occa-sion in this case?
>
> [Cordova]. Yes.
>
> Q. Okay. About May the 21st?

A. That is correct.

Q. Okay. You were testifying under oath?

A. That's correct.

Q. Okay. And at that point, you swore to tell the truth?

A. That is correct.

Q. Okay. And in fact, did you tell the truth at that hearing?

A. To the best of my knowledge, I did.

Q. Is that a yes or a no?

A. To the best of my knowledge, yes.

Q. At the time you gave that testimony, did you believe you were telling the truth?

A. Yes.

Q. You did believe you were telling the truth?

A. Yes.

Q. Okay. Now, at that hearing, you re-call someone asking you, 'At the time of the arrest, did Mr. Davila make any comment?' And responding to that question, 'Not to my knowledge.'

A. Yes.

Q. Do you remember making that state-ment?

A. Yes.

Q. Okay. You did, in fact say, 'Not to my knowledge? No, Mr. Davila did not make any statements.'

A. I did state, not to my knowledge.

Q. Okay. Now, can you tell the ladies and gentlemen of the jury that yes, in fact, he did make a statement?

A. Yes, he did.

7. The State suggests that adoption of the civil methodology is acceptable. Although a criminal defendant is not required to preserve legal suffi-ciency, the State argues that a civil litigant need not preserve a legal sufficiency complaint by motion for new trial but is required to preserve a factual sufficiency point by motion for new trial. This statement is not entirely accurate. Neither factual sufficiency nor legal sufficiency points need to be preserved by a motion for new trial in a non-jury case. Further, although a motion for new trial is not a prerequisite to attacking the legal sufficiency of the evidence in a jury trial, the Supreme Court has nevertheless required that error must be preserved in some manner. In *Aero Energy, Inc. v. Circle C Drilling Company*, 699 S.W.2d 821 (Tex.1985), the Court deter-mined that as a prerequisite to a no evidence point of error on appeal from a jury trial, the appellant must have presented the no evidence point to the trial court by motion for instructed verdict, objection to the submission of the special issue, motion for judgment *non obstante veredic-to*, motion to disregard the contested jury find-ings, or motion for new trial. *See also, Salinas v. Fort Worth Cab & Baggage Company, Inc.*, 725 S.W.2d 701 (Tex.1987).

Q. Okay. And once again, today, you are sworn to tell the truth. Correct?

A. That is correct.

Q. Okay. Back then you swore to tell the truth. Correct?

A. That's correct.

Q. Okay. Which one of those statements is the truth?

A. They were both true at the time. I did not read the case report prior to that testimony, *giving it at the parole hearing.*

[Davila's counsel]. Objection, Your Honor. Non-responsive.

[The Court]. Your objection is overruled.

[Davila's counsel]. I also move for a mistrial, Your Honor. That—

[The Court]. That will be denied, also.

Q. [By Davila's counsel]. You made a statement under oath. Correct?

A. That is correct.

Q. And you are telling the jury that both of these statements were true?

A. And I am telling the jury that at the moment of that testimony that it was, it was true to the best of my knowledge. *Like I said before, I did not read the case report prior to that parole board hearing.*

[Davila's counsel]. Objection once again Your Honor. Asked—

[The Court]. That will be overruled.

[Davila's counsel]. Once again, I move for a mistrial.

[The Court]. That will be overruled.

Q. [By Davila's counsel]. Okay. You gave that statement on May the 21st, correct? *At this hearing?* Or was it May the 20th? [Emphasis added].

After the State had put on two additional witnesses, Davila renewed his objection to Cordova's statements concerning Davila's parole revocation hearing. For the first time, Davila asserted as grounds for objection that the statements were not relevant to the issues in the case, that they were more prejudicial than probative, and that they were evidence of an inadmissible extraneous offense.

Generally, evidence of collateral crimes, wrongs, or acts is inadmissible. *See* Tex. R.Crim.Evid. 404(b); *see also, Fuller v. State,* 827 S.W.2d 919, 926 (Tex.Crim.App. 1992), *cert. denied,* 509 U.S. 922, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993); *Couret v. State,* 792 S.W.2d 106, 107 (Tex.Crim.App. 1990) ("The general rule is that an accused is entitled to be tried for the offense for which he is charged and not for some collateral crime or for being a criminal generally."). Cordova's nonresponsive explanation as to why his statements appeared inconsistent included information about one of Davila's parole board hearings. From this information, the jury could infer that Davila had served time for some past offense. Both sides concede that this situation violates the general rule. We agree, and conclude that the trial court erred in overruling the objection. The State asserts that Davila has waived this error or, in the alternative, that it was harmless.

 As a threshold matter, we observe that a point of error on appeal must present the same legal theory as was presented to the trial court through a timely, specific objection. *See Sterling v. State,* 800 S.W.2d 513, 520–21 (Tex.Crim.App.1990), *cert. denied,* 501 U.S. 1213, 111 S.Ct. 2816, 115 L.Ed.2d 988 (1991); *Coffey v. State,* 796 S.W.2d 175, 179–80 (Tex.Crim.App.1990); *Maldonado v. State,* 902 S.W.2d 708, 711 (Tex.App.—El Paso 1995, no pet.). An appellant who fails to preserve this parity in legal theories presents nothing on which an appellate court may act. *Sterling,* 800 S.W.2d at 521. This rule logically follows from the general rule that a party must timely present a specific objection of any error to the trial court. *Id.;* Tex.R.Crim. Evid. 103(a). Davila objected to Cordova's nonresponsive explanation of the perceived discrepancy in his testimony. He did not initially object to the presentation of collateral crimes evidence. The two objections present distinct legal theories. An objection as to nonresponsiveness does not preserve error as to the inadmissibility of extraneous offenses. *Muhammad v. State,* 846 S.W.2d 432, 436 (Tex.App.—Houston [14th Dist.] 1992, pet. ref'd). Regardless of the merits of

the latter possible objection, it was not timely presented to the trial court.[8]

In the interest of justice, however, we address the merits of the complaint. Pursuant to TEX.R.APP.P. 81(b)(2), we must determine beyond a reasonable doubt that the introduction of evidence concerning extraneous offenses contributed to neither conviction nor punishment. In so doing, we must apply the harm analysis prescribed by the Court of Criminal Appeals in *Harris v. State*, 790 S.W.2d 568, 583–88 (Tex.Crim.App. 1989), which requires a court to "examine the source of the error, the nature of the error, whether or to what extent it was emphasized by the State, and its probable collateral implications." *Id.* at 587. Cordova's conflicting testimony was introduced by Davila. While he attempted to skirt the exact nature of the prior hearing, he did open the door to its existence through his impeachment attempt, not once but twice. Though the State may have been prevented from introducing its exact nature, the fact remains that it did not attempt to do so and that any information about the hearing's nature was leaked through Davila's examination. The State did not attempt to capitalize on this information by including it as a building block of its case. It did not try to tie any possible prior convictions Davila may have had to Davila's guilt for the charged crime. Instead, the State relied on the other evidence that *it* presented during trial. Finally, we recognize that during voir dire, the jury was questioned on the range of punishments arising from the enhancement paragraphs. This sliver of information of Davila's past can hardly be said to have so inflamed the minds of the jury that it definitely contributed to their verdict of guilt. *See Fuller*, 827 S.W.2d at 926–27 (single nonresponsive answer by an investigating detective referencing the Texas Department of Corrections amounted to only harmless error). With regard to the punishment stage, we note that evidence was admitted concerning eight prior offenses, at least one of which resulted in a parole revocation. The error was equally harmless in that context. We hasten to add, however, that we are dismayed that the initial objection was overruled and that Cordova jumped at the chance to reiterate his statement regarding the parole revocation hearing. We strongly discourage this conduct and in an appropriate setting, such behavior could indeed constitute reversible error. Point Error No. One is overruled.

### *Chain of Custody*

In his third point of error, Davila asserts that the syringe taken by the officers at the scene should have been excluded because a proper foundation had not been laid. Cordova testified about the circumstances surrounding the syringe's discovery:

[State]: Okay. And you and your partner were together that day?

[Cordova]: Yes, we were.

[State]: Your Honor, may I approach the witness?

[The Court]: Yes.

[State]: Officer, I am showing you what has been marked as State's exhibit number 1. Do you recognize it?

[Cordova]: Yes, I do.

Q. And what is it, sir?

A. It is a syringe. Inside a syringe holder.

Q. And what exactly is the syringe holder?

A. It is a—it is just a protective casing so that nobody gets stuck with the needle. It is as contaminated.

Q. And is that common procedure? Do you always put the syringe in those syringe holders?

A. Yes, we do.

Q. And what is the same—that is the same syringe that you saw on March 2nd of 1994 being held by the defendant?

A. Yes, it is.

---

8. Davila did present the collateral crimes legal theory to the trial court towards the end of the guilt or innocence phase of the trial. However, this objection, presented under the guise of renewing the nonresponsive objection, was not timely pursuant to the rule. *See, e.g., Thomas v.*

*State*, 884 S.W.2d 215, 216 (Tex.App.—El Paso 1994, pet. ref'd) ("To be timely, an objection must be raised at the earliest opportunity or as soon as the ground of objection becomes apparent."). Accordingly, it failed to preserve error.

Q. And how do you know that?

A. It has got my initials with a date on the syringe holder. This is my writing on the back.

Q. What exactly do the initials and the date say?

A. Sorry, I could not hear you.

Q. What exactly is written on the syringe holder? What exactly did you put? Your identifying marks.

A. My initials and the date.

Q. And could you read them to us?

A. Yes, G.C. 3/2 or '94 on the contaminated label that has got the date also which is 3/2/94 and the cause number to this case which is 94061307.

Q. And once you recovered this syringe what exactly did you do with it?

A. We tagged it and turned it in as evidence.

Q. *Do you remember who exactly picked up the syringe?*

A. *No, ma'am. I don't remember. I believe it was my partner.*

Q. Okay. So the way it works is that you pretty much divide the work among yourselves?

A. Yes, we do.

Q. So while one officer is doing one thing, the other officer is doing another?

A. Yes.

Q. And is there ever a situation where you have to observe each other?

A. Yes, sir. There is. It is always the filtering and also the Field Training Officer, him being the trainer. I believe he did most of the report itself.

Q. Other than the marks that you put on it, is it in the same condition that it was on that day?

A. Yes, it is. Without opening it, as far as I can see through the—the clear holder, yes, it is.

Q. And has it been tampered with in any way?

A. No.

Q. And you stated that you picked that up into evidence and then you submitted it where?

A. This is submitted to the property office.

 . . .

Q. Let's get back to—Your Honor, at this point we would like to offer State's exhibit number 1 into evidence.

[Davila's counsel]: Subject to all of our prior objections, we renew all our prior objections. And I would also, once again renew the relevancy objection. I don't think they have absolutely proven that it is the same syringe that was picked up there at the scene.

[The Court]: All right, sir. Those objections will be overruled and the exhibit will be admitted. [Emphasis added].

Davila asserts that there is no evidence linking the syringe offered into evidence with the syringe allegedly belonging to Davila. He claims that at best, Cordova's testimony reflects that Cordova placed a syringe into a syringe holder and then marked that holder. He argues that a gap in the chain of custody exists because Cordova failed to demonstrate that Rodriguez handed him the seized syringe. At the outset, we note that Davila was not charged with drug usage [cocaine which may have been in the syringe] but with drug possession [cocaine that was found to exist in the baggie]. We reiterate that the syringe contained no residue and was not tested.

■ Cordova testified that the syringe produced was the same syringe he observed in Davila's possession. Assuming without deciding that admission of the syringe was error due to a flawed chain of custody, it constitutes harmless error.

*Penitentiary Packets*

In his second point of error, Davila asserts that the trial court erred in admitting State's Exhibit No. Five, one of six penitentiary packets allegedly belonging to Davila offered by the State as support for the habitualization count of the indictment. The State used a fingerprint expert to link each penitentiary packet with an exemplar of Davila's fingerprints. Davila asserts that the penitentiary packet in question was not properly authenticated because the packet's fingerprint card

was not *physically attached* to the packet itself. In other words, Davila asserts that a staple affixing the fingerprint card to the remainder of the contents of the penitentiary packet was required in order to satisfy TEX. R.CRIM.EVID. 901 and 902. This argument would be more persuasive if the fingerprint card possessed no other means of identification connecting it to the penitentiary packet. However, the name on the fingerprint card, Armando S. Davila, corresponds exactly with the name used throughout the penitentiary packet. Even more convincingly, the Texas Department of Corrections prisoner number on the fingerprint card matches the number used in both the penitentiary packet and on the photograph contained in the packet. With this photograph, the jury could have associated the penitentiary packet with Davila.

▮ Authenticated records of the Texas Department of Corrections may be used to provide proof of prior convictions supporting the habitualization paragraph of an indictment. *See Beck v. State,* 719 S.W.2d 205, 210 (Tex.Crim.App.1986); *Owens v. State,* 851 S.W.2d 398, 399 (Tex.App.—Fort Worth 1993, no pet.); TEX.CODE CRIM.PROC. ANN. art. 37.07 § 3(a) (Vernon Supp.1996). The penitentiary packets, however, are not sufficient on their own to prove the prior convictions. *See Beck,* 719 S.W.2d at 210. Additional evidence must be presented showing that the person convicted as related in the penitentiary packet is the same person at trial. *Beck,* 719 S.W.2d at 210. Here, this was accomplished when the fingerprint expert compared Davila's fingerprints contained on the exemplar to those in the packet. Deficiencies in the packet, such as the fingerprint card not being physically attached to the packet, go to the weight and not the admissibility of the evidence. *See Robinson v. State,* 739 S.W.2d 795, 802 (Tex. Crim.App.1987); *Pachecano v. State,* 881 S.W.2d 537, 545 (Tex.App.—Fort Worth

1994, no pet.). Point of Error No. Two is overruled.

### *Sentencing from Prior Convictions*

▮ In Points of Error Nos. Four and Five, Davila asserts that the trial court erred in admitting the sentences imposed in each of his prior convictions. He alleges that this evidence was not relevant proof for the enhancement or habitualization counts in the indictment and that any probative value it contained was substantially outweighed by the risk of unfair prejudice.[9] His complaint centers on the argument that the jury could compare the dates of the convictions with the sentences imposed and infer information about parole eligibility. As a matter of pure axiom, the State is prohibited from inducing the jury through argument to consider parole laws when imposing a sentence. *See Smith v. State,* 898 S.W.2d 838, 852 n. 20 (Tex.Crim.App.1995); *Clark v. State,* 643 S.W.2d 723, 724–25 (Tex.Crim.App.1982). Evidence of the operation of parole laws is not admissible as proof of an enhancement count. TEX.CODE CRIM.PROC.ANN. art. 37.07 § 4(d). However, not all evidence insinuating the application of parole laws is necessarily prohibited. *Cf. Smith,* 898 S.W.2d at 852–53. This is especially true with respect to evidence of sentences imposed on prior convictions used as proof for enhancement purposes. Such evidence has been held admissible. *See Beck,* 719 S.W.2d at 210 (stating that "[w]hen certified copies of a judgment and sentence and the authenticated records of the Texas Department of Corrections or other penal institutions are used, these documents have been held admissible"); *Todd v. State,* 598 S.W.2d 286, 292–93 (Tex.Crim.App.1980); *Owens,* 851 S.W.2d at 399 ("The State may [offer proof supporting the enhancement count] by introducing authorized copies of the Texas Department of Corrections records, including the judgment

9. The record reflects that Davila was convicted of: unlawful delivery of heroin on July 16, 1987, and sentenced to fifteen years; theft of over $200 on November 9, 1977, and sentenced to life; attempting to pass a forged instrument and possession of heroin on September 4, 1974, and sentenced to concurrent five year sentences; burglary on April 3, 1968, and sentenced to three years; breaking and entering a vehicle on September 28, 1964, and sentenced to one year; theft from a person on November 18, 1964, and sentenced to two years; burglary on September 25, 1962, and sentenced to three years.

and sentence."). Points of Error Four and Five are overruled.

### *1993 Amendments to Texas Penal Code*

In Points of Error Nos. Eight through Ten, Davila asserts that the trial court erred in failing to sentence him in accordance with the 1993 amendments to the Texas Penal Code, effective September 1, 1994. Prior to the amendment, possession of less than twenty-eight grams of cocaine was classified as a second degree felony. Acts 1989, 71st Leg., R.S., ch. 678, § 1, 1989 TEX.GEN.LAWS 2230, 2936–37. This offense was also subject to enhancement. TEX.PENAL CODE ANN. § 12.42(d) (Vernon 1994). Pursuant to the 1993 amendments, possession of less than one gram of cocaine is classified as a state jail felony. TEX.HEALTH & SAFETY CODE ANN. § 481.115(b) (Vernon Supp.1996). The penalty range for this offense is not more than two years and not less than 180 days confinement in state jail. TEX.PENAL CODE ANN. § 12.35(a). Davila was sentenced for a second degree felony enhanced by two prior convictions. He received the maximum allowable, ninety-nine years.

In amending the Penal Code, the Legislature specifically provided that an offense committed before the effective date of the amendments is governed by the law in effect when the offense was committed. Acts 1993, 73rd Leg., R.S., ch. 900, § 1.18(b), 1993 TEX. GEN.LAWS 3705. Accordingly, the amendments apply only to offenses committed on or after September 1, 1994. *Delgado v. State,* 908 S.W.2d 317, 318 (Tex.App.—El Paso 1995, pet. ref'd); *Perry v. State,* 902 S.W.2d 162, 163 (Tex.App.—Houston [1st Dist.] 1995, pet. ref'd); *Wilson v. State,* 899 S.W.2d 36, 38–39 (Tex.App.—Amarillo 1995, pet ref'd). The offense here occurred on March 2, 1994.

Davila asserts that Section 311.031 of the Code Construction Act entitles him to be sentenced in accordance with the revised version of the statute under which he was convicted. TEX.GOV'T CODE ANN. § 311.031(b) (Vernon 1988). This provision provides for sentencing under an amended statute where the amendment reduces the punishment for

an offense if punishment has not been imposed. *Id.* This general clause, however, conflicts with the specific savings provision of the later enacted legislation amending the Penal Code and therefore is inapplicable. TEX.GOV'T CODE ANN. § 311.026(b); *Delgado,* 908 S.W.2d at 318–19; *Wilson,* 899 S.W.2d at 38–39. Because Davila committed the offense six months before the amendments went into effect, the trial court properly applied the prerevision version of the Penal Code in assessing punishment. Points of Error Nos. Eight through Ten are overruled.

### CRUEL OR UNUSUAL PUNISHMENT

In his final point of error, Davila asserts that the imposition of a ninety-nine year prison sentence for possessing a scant seven milligrams of cocaine violated the cruel or unusual provision of the Texas Constitution.[10] TEX. CONST. art. I, § 13. Davila was sentenced for the commission of a second degree felony enhanced by two prior convictions. The Penal Code sets the punishment range under this scenario at life imprisonment, or for any term of not more than ninety-nine years or less than twenty-five years. TEX.PENAL CODE ANN. § 12.42. Clearly, Davila was sentenced within this range allowable by the statute. The courts of this State have consistently held that a punishment assessed within the statutory range is not cruel or unusual. *See Belton v. State,* 900 S.W.2d 886, 899 (Tex.App.—El Paso 1995, pet. ref'd); *Lackey v. State,* 881 S.W.2d 418, 420 (Tex. App.—Dallas 1994, pet. ref'd); *Lavigne,* 782 S.W.2d at 256. Accordingly, this point of error is overruled.

### CONCLUSION

Having overruled all points of error, the conviction is affirmed.

---

10. Davila's final point of error is enumerated as Point of Error No. Twelve, but it is in reality the eleventh point of error. There is no point of error denominated as Point of Error No. Eleven.