NUMBER 13-08-00205-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


REBEKAH RACHELL SHROPSHIRE, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 24th District Court of DeWitt County, Texas.


 


MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Rodriguez and Garza


Memorandum Opinion by Justice Garza



 A DeWitt County jury convicted appellant, Rebekah Rachell Shropshire, of murder,
a first-degree felony. See Tex. Penal Code Ann. § 19.02 (Vernon 2003). Shropshire was
sentenced to seventy-five years' imprisonment. She now appeals the conviction,
contending by three issues that: (1) she was denied a fair and impartial trial due to
ineffective assistance of counsel; (2) the evidence was factually insufficient to support the
jury's verdict; and (3) the sentence imposed constitutes cruel and unusual punishment. 
We affirm.


I. Background

 On October 2, 2007, appellant was charged by indictment with the murder of her
estranged husband, William Shropshire Jr. At trial, which commenced on March 31, 2008,
the jury heard the testimony of several witnesses describing events that occurred on the
afternoon of January 21, 2007, in Cuero, Texas.

 Sam Jones, a patrol officer with the Cuero Police Department, testified that he
received a dispatch on that day notifying him that a "hysterical female" had called 911
"claiming that she had stabbed her husband and she thinks he's dying." He proceeded to
the scene, where he observed a black male laying on the floor of an apartment with
appellant, who appeared "very upset," holding the victim in her lap. Officer Jones, a trained
emergency medical technician, testified that when he attempted to assist the injured man,
he "saw a large blood stain, fresh blood stain on the front of [the victim's] shirt. I lifted up
the shirt and observed a--about a half-inch stab wound about two inches above his right
nipple." Officer Jones stated that he could tell the wound was fairly serious because the
victim was breathing only "about six times a minute" and the pulse in his carotid artery was
"weak and slow." Officer Jones testified that he heard appellant say that she stabbed the
victim. When asked whether appellant made a comment as to "how deep the wound might
have been," Officer Jones replied in the affirmative and noted that "[s]he [appellant] said
it only went in about an inch."

 On cross-examination, Officer Jones acknowledged that appellant had the victim
"cradled in her arms" when he arrived at the scene. He also agreed that appellant is "a
petite or small individual" and that the victim appeared to be larger and heavier than she. 
However, when asked whether it would be fair to say that "[appellant] was attempting to
help [the victim]," Officer Jones disagreed, noting that "it just seemed like she was--all she
was doing was holding him. . . . She did not have the wound covered to try to control
bleeding or anything like that."

 Sergeant Santos Calderon, who accompanied Officer Jones to the scene, testified
that the Shropshires' two minor children were present at the apartment where the incident
took place. He further stated that:

When we walked in or rushed into the apartment the--Mrs. Shropshire was
crying and upset. We hadn't said anything at this point in time when
she--when we heard her. Well, I know I heard her yelling that she--that she
stabbed Mr. Shropshire and but at the same time she no sooner said that
she added that but I only--I stabbed him once but it only went in about an
inch.


According to Sergeant Calderon, appellant expressed to him that she had engaged in an
argument with the victim and that "he had come at her one time" in the kitchen prior to the
stabbing; however, appellant did not indicate that the victim attempted to choke her. 
Sergeant Calderon stated that he then asked appellant to locate the weapon that she used
to stab the victim. Appellant responded by walking over to the kitchen sink and picking up
a knife out of the sink. (1) The knife, which Sergeant Calderon stated appeared to be a steak
knife, was recovered by police and was introduced into evidence at trial.

 Sergeant Calderon acknowledged on cross-examination that: (1) the police did not
check the apartment for any other weapons; (2) the police did not check other knives
stored in a block in the kitchen of the apartment; and (3) the police did recover medications
from the apartment belonging to appellant, which appellant had pointed out to them.

 Officer Jeremiah Gatica of the Cuero Police Department was also dispatched to the
scene. He testified as to appellant's remarks to him when he arrived:

Rebekah stated that William had just arrived from the grocery store and that
William had given her--their son something to eat. Rebekah stated that she
was upset with William because of the fact that he did not give her son
enough food to eat. She stated that she then went to the kitchen counter
and began slicing bread with a knife. Rebekah stated that William was
cursing at her and that he was approaching her from behind. Rebekah
stated that she did tell him to leave; however, he didn't. Rebekah stated that
at that point she stabbed him with a knife.


Officer Gatica noted that appellant never stated that the victim struck or choked her prior
to the stabbing.

 Lieutenant Chris Hernandez, an investigator with the Cuero Police Department,
testified that he attempted on several occasions to contact appellant in order to take her
formal statement. According to Lieutenant Hernandez, he was never able to speak with
appellant but, rather, was told by appellant's father that her attorney had advised her not
to talk with police.

 Medical examiner Ruth E. Kohlmeier, M.D., testified that she performed an autopsy
on the victim. Dr. Kohlmeier opined that the cause of the victim's death was a stab wound
to the chest and that the depth of the wound was, in fact, around three to five inches. She
further stated that she could clearly observe where the knife had traveled through the
victim's body--through the skin, ribs, the right lung, and penetrating the right atrium of the
heart. Dr. Kohlmeier testified that the wound was consistent with an "overhand swing" of
the knife because the knife blade traveled "right to left, downward and front to back." She
further observed that "the entire knife blade went through the body all the way to the handle
because you have the hilt mark [on the victim's chest]." According to Dr. Kohlmeier,"[a]
tremendous amount of force" would have been necessary to inflict the damage that she
observed.

 Appellant's father, James Jackson, testified in her defense. Jackson stated that he
resides at the apartment where the stabbing took place and that on January 21, 2007, he
was living there with his son as well as with appellant and her two young children. He
stated that he had left the apartment with his son to go to Victoria before the incident in
question occurred. At that time, according to Jackson, there were several weapons in the
apartment, including a shotgun and two rifles. Jackson stated that he never kept the
weapons loaded while his grandchildren were in the apartment.

 Jackson further testified that appellant and her husband were separated for several
years as of January 2007, and that he did not allow his son-in-law to enter the residence
without his permission. According to Jackson, appellant is a "very bad asthmatic," is
"disabled," and is receiving social security disability benefits. Jackson stated that he was
concerned about his daughter when he left the house on January 21, 2007, because "she
had been sick the night before with asthma."

 Appellant then took the witness stand after being admonished by the court as to her
right not to testify. She stated that she did not murder her husband, nor did she intend to
stab him. Appellant stated she was "legally disabled" due to asthma and major depressive
disorder. When asked about how she felt on January 21, 2007, appellant stated: 

I was very weak, very weak and very tired because I was out of breath. They
had applied [sic] me on some--they gave me a steroid shot a couple nights
before in E.R., and I was taking other medications due to the asthma that I
automatically take and due to the major depression. So I was very, very
weak, very tired. I wasn't eating right so my nutrition was not right and
sometimes I would faint and a lot of times I couldn't get of bed.


 According to appellant, her husband came to the apartment at around 3:00 p.m. on
January 21, 2007, at which point she asked him to leave because her father was not
present. In response, "[h]e said he was not going to go anywhere because he just wanted
to spend some time with his kids and he had the right." Approximately fifteen minutes after
her husband arrived, appellant heard her son crying "[at] the top of his lungs." She stated
that she and her husband then "got into an argument because my husband had hit my
son." Appellant described what happened next:

A. [Appellant] And he got in my face and told me he was not
going to go anywhere. . . . And I told him I said
I'm sick. I don't feel too well. I'm weak and I
don't feel like arguing could you please leave
and he said no. And he started hitting me
upside the head with his hand . . . . In my mind
I was just hoping that my father would hurry and
come home so I didn't try to call 911. I wasn't
thinking of doing anything like that because I
thought my dad would come home any minute
and when I asked Mr. Shropshire the third time
I said could you please go, you do not belong
here. He got extremely upset and he said he
was not going anywhere and he rushed me
against the stove and tried--and started choking
me.


Q. [Defense counsel] What happened after that?


A. After that he jumped back and he walked into the
living room and he fell to the floor.


Q. What did you do?


A. I went running towards Mr. Shropshire and
because I thought he had--he was having a
seizure and I looked down at him and I seen
blood on his shirt and I hurried up and I attempt
to call 911 and I asked the dispatch woman to
please get me help because I had stabbed my
husband but it wasn't something that I
intentionally wanted to do and it wasn't
something that was done [with] intent. I
mentioned I had stabbed him because I wanted
them to hurry and that's something that
happened after effect [sic].


 The jury found appellant guilty of murder as alleged in the indictment. 
Subsequently, several of appellant's friends and acquaintances, along with appellant's
counselor, testified at the sentencing phase of the trial, urging leniency on behalf of
appellant. The jury assessed appellant's punishment as seventy-five years' confinement
in the Institutional Division of the Texas Department of Criminal Justice. Appellant then
filed a motion for new trial, contending in part that her sentence was unconstitutionally cruel
and unusual. See U.S. Const. amends. VIII, XIV; Tex. Const. art. I, § 13. That motion
was overruled by operation of law. See Tex. R. Civ. P. 329b(c). This appeal followed.

II. Discussion

A. Ineffective Assistance of Counsel

 By her first issue, appellant contends that she was denied a fair and impartial trial
due to the ineffectiveness of her trial counsel. She argues specifically that her counsel was
ineffective because he failed to object at trial to the admission of testimony by Lieutenant
Hernandez regarding appellant's "refusal to provide a statement or be interviewed by law
enforcement."

 To establish a claim for ineffective assistance of counsel, appellant must show (1)
her attorney's representation fell below an objective standard of reasonableness, and (2)
there is a reasonable probability that, but for her attorney's errors, the result of the
proceeding would have been different. Strickland v. Washington, 466 U.S. 664, 668
(1984); Hernandez v. State, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986); Jaynes v. State,
216 S.W.3d 839, 851 (Tex. App.-Corpus Christi 2006, no pet.). Whether this test has
been met is to be judged on appeal by the totality of the representation, not by any isolated
acts or omissions. Jaynes, 216 S.W.3d at 851. The burden is on the appellant to prove
ineffective assistance of counsel by a preponderance of the evidence. Id. Our review of
counsel's representation is highly deferential, and we will find ineffective assistance only
if the appellant overcomes the strong presumption that her counsel's conduct fell within the
wide range of reasonable professional assistance. See Strickland, 466 U.S. at 689;
Jaynes, 216 S.W.3d at 851. Further, the acts or omissions that form the basis of
appellant's claim of ineffective assistance must be evidenced by the record. See
Thompson v. State, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999); Jaynes, 216 S.W.3d at
851. In most cases, a silent record which provides no explanation for counsel's actions will
not overcome the strong presumption of reasonable assistance. Mallett v. State, 65
S.W.3d 59, 63 (Tex. Crim. App. 2001); Thompson, 9 S.W.3d at 813-14. 

 A defendant's post-arrest silence may not be used against her at trial. Sanchez v.
State, 707 S.W.2d 575, 578 (Tex. Crim. App. 1986); Nixon v. State, 940 S.W.2d 687, 692
(Tex. App.-El Paso 1996, pet. ref'd). A comment on a defendant's post-arrest silence
violates the defendant's right to be free from compelled self-incrimination. Doyle v. Ohio,
426 U.S. 610, 617-18 (1976); Sanchez, 707 S.W.2d at 578; Sutherlin v. State, 682 S.W.2d
546, 548 (Tex. Crim. App. 1984); see U.S. Const. amend. V; Tex. Const. art. I, § 10. 
Such a comment is akin to a comment on the defendant's failure to testify at trial, because
it attempts to raise an inference of guilt arising from the invocation of a constitutional right. 
Dinkins v. State, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995).

 Here, appellant argues that her trial counsel should have objected to Lieutenant
Hernandez's testimony that he unsuccessfully attempted on several occasions to contact
appellant in order to take her formal statement regarding the events of January 21, 2007. 
Appellant contends that "[s]uch testimony was a direct comment on Appellant's assertion
of her Fifth Amendment rights prior to trial" and that "there is no trial strategy that can be
asserted to justify such failure to object." In response, the State argues that: (1)
Lieutenant Hernandez's testimony was admissible because appellant's counsel had
previously "opened the door" to such testimony by asking Sergeant Calderon and Officer
Gatica whether they took written statements from appellant; and (2) even if such testimony
was inadmissible, counsel was not ineffective for failing to object because such failure may
have been the product of a valid trial strategy.

 Without determining whether the testimony was in fact admissible, we agree with
the State that counsel's failure to object was not unreasonable. Lieutenant Hernandez
stated that he made several attempts to take appellant's statement, but that he was told
at each juncture that appellant's attorney had advised her not to speak with law
enforcement. As the State notes, it is conceivable that counsel was employing a valid trial
strategy by declining to object to this testimony. Specifically, the strategy may have been
to show that appellant in fact wanted to speak to police about the incident but that her
attorneys--who had been replaced by new counsel prior to trial--did not allow her. (2) 
Further, by objecting, counsel may have drawn attention to the fact that appellant declined
to give a formal statement to police; it is conceivable that counsel decided not to object in
order to avoid this.

 Without anything in the record establishing counsel's reasons for not objecting to
Lieutenant Hernandez's testimony, we cannot say that counsel performed unreasonably. 
See Mallett, 65 S.W.3d at 63; Thompson, 9 S.W.3d at 813-14. We therefore conclude that
appellant has failed to overcome the "strong presumption" that her trial counsel provided
reasonable assistance. See Strickland, 466 U.S. at 689; Jaynes, 216 S.W.3d at 851. 
Appellant's first issue is overruled.

B. Factual Sufficiency of the Evidence

 Appellant argues by her second issue that the evidence adduced at trial was
factually insufficient to support her conviction. In conducting a factual sufficiency review,
we consider all the evidence in a neutral light and ask whether the jury was rationally
justified in finding guilt beyond a reasonable doubt. Grotti v. State, 273 S.W.3d 273, 283
(Tex. Crim. App. 2008) (citing Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App.
2006)). The verdict will be set aside only if (1) it is so contrary to the overwhelming weight
of the evidence as to be clearly wrong and manifestly unjust, or (2) it is against the great
weight and preponderance of the evidence. Watson, 204 S.W.3d at 415 (citing Johnson
v. State, 23 S.W.3d 1, 10 (Tex. Crim. App. 2000)).

 Factual sufficiency is measured by the elements of the offense as defined by a
hypothetically correct jury charge. Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App.
1997); Adi v. State, 94 S.W.3d 124, 131 (Tex. App.-Corpus Christi 2002, pet. ref'd). Under
a hypothetically correct jury charge, appellant committed the offense of murder if she (1)
intentionally or knowingly caused her husband's death, or (2) intended to cause serious
bodily injury and committed an act clearly dangerous to human life that caused her
husband's death. See Tex. Penal Code Ann. § 19.02(b)(1), (2). A person acts
intentionally with respect to a result of her conduct when it is her conscious objective or
desire to engage in the conduct or cause the result. Id. § 6.03(a) (Vernon 2003). A person
acts knowingly with respect to a result of her conduct when she is aware that her conduct
is reasonably certain to cause the result. Id. § 6.03(b).

 Appellant argues that "the facts of the case lend themselves clearly [to the
conclusion] that the death of William Shropshire was unintended and not [the] result of an
intentional act." Appellant points to the following undisputed facts in arguing that the
verdict was against the great weight and preponderance of the evidence: (1) appellant was
"distraught, hysterical, crying, screaming, and falling to the floor" immediately after the
stabbing; (2) she cradled the victim in her lap after the stabbing; (3) the apartment "was full
of other potential weapons" which appellant could have used, but did not use, to kill the
victim; and (4) appellant is a severe asthmatic while the victim was a "taller, bigger, fit
man." Nevertheless, the evidence also established that: (1) appellant got into an
argument with the victim just prior to the stabbing; (2) she did not tell anyone at the scene
of the incident that the victim had choked her or that she was acting in self-defense; and
(3) a "tremendous amount" of force would have been necessary to cause the injury
sustained by the victim. Appellant argues that such a wound "is more consistent with the
decedent approaching Appellant and forcing himself into her, not knowing of the knife she
had in her hands." However, even if we were to agree with this inference, we may not
substitute our own determination for that of the jury. See Ortiz v. State, 93 S.W.3d 79, 87-88 (Tex. Crim. App. 2002) (citing Wesbrook v. State, 29 S.W.3d 103, 112 (Tex. Crim. App.
2000)). Moreover, we may not "substantially intrude upon the jury's role as the sole judge
of the weight and credibility of witness testimony." Id. The jury could have rationally
concluded from the evidence adduced, including the medical examiner's testimony, that
appellant possessed the requisite intent to sustain a conviction of murder. See Grotti, 273
S.W.3d at 283 (citing Watson, 204 S.W.3d at 414-15); Manrique v. State, 994 S.W.2d 640,
649 (Tex. Crim. App. 1999) ("A jury may infer intent from any facts which tend to prove its
existence, including the acts, words, and conduct of the accused, and the method of
committing the crime and from the nature of wounds inflicted on the victims.")

 Considering all the evidence in a neutral light, we cannot say that the jury's verdict
was so contrary to the overwhelming weight of the evidence as to be clearly wrong and
manifestly unjust, nor can we say that the verdict was against the great weight and
preponderance of the evidence. See Watson, 204 S.W.3d at 415 (citing Johnson, 23
S.W.3d at 10). Appellant's second issue is therefore overruled.

C. Cruel and Unusual Punishment

 By her third issue, appellant contends that the sentence of seventy-five years'
imprisonment imposed by the jury constitutes cruel and unusual punishment in violation
of the United States and Texas Constitutions. See U.S. Const. amends. VIII, XIV; Tex.
Const. art. I, § 13.

 Appellant does not dispute that her sentence falls within the range allowable by
statute. See Tex. Penal Code Ann. § 12.32 (Vernon 2003) (providing that a first-degree
felony is punishable by imprisonment for life or for any term of not more than ninety-nine
years or less than five years and a fine not to exceed $10,000). Generally, a punishment
assessed within the statutory range is not considered cruel or unusual. See Davila v.
State, 930 S.W.2d 641, 654 (Tex. App.-El Paso 1996, pet. ref'd); Lackey v. State, 881
S.W.2d 418, 420 (Tex. App.-Dallas 1994, pet. ref'd). However, it is possible for a
sentence within the statutory range to nonetheless be ruled unconstitutional if it is "grossly
disproportionate" to the crime. Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (3); Solem
v. Helm, 463 U.S. 277, 290 (1983); McGruder v. Puckett, 954 F.2d 313, 316 (5th Cir.
1992). Punishment will be considered "grossly disproportionate" to the crime only when
an objective comparison of the gravity of the offense against the severity of the sentence
reveals the sentence to be extreme. Harmelin, 501 U.S. at 1005. If we find the sentence
to be "grossly disproportionate," we then consider (1) sentences imposed for other crimes
in the same jurisdiction, and (2) sentences imposed for commission of the same crime in
other jurisdictions. See Solem, 463 U.S. at 292; McGruder, 954 F.2d at 316; Mullins v.
State, 208 S.W.3d 469, 470 (Tex. App.-Texarkana 2006, no pet.).

 Appellant's entire argument on appeal with respect to this issue is as follows:

 The State did not call one witness to testify during the punishment
phase, instead relying upon the evidence presented during the
guilt/innocence phase. However, Appellant called four lay witnesses, all who
knew Appellant and all who testified that leniency was warranted in this
matter. The evidence produced by Appellant during her punishment phase
was clearly that Appellant is a loving, caring[ ]person who is loved by many
persons in her community and her church. More importantly, her therapist
and counselor[ ]testified that the jury should be lenient with her as she could
be rehabilitated and could lead an eventful life. The State, on the other
hand, failed to show future dangerousness of Appellant.


The State generally agrees with the factual contentions made in appellant's argument, but
argues that the evidence provided at the guilt/innocence phase of the trial, which the State
re-offered at the punishment phase, was enough to support the seventy-five year
sentence.

 Comparing the gravity of the offense to the severity of the sentence, we cannot say
that the seventy-five year sentence is "grossly disproportionate" to the crime in this case. 
The evidence established that the victim suffered a violent, forceful knife attack at the
hands of his wife while their two children were present. The fact that appellant's friends
and counselor believed that the jury should be lenient in sentencing appellant does not
affect in any way our analysis of the gravity of the offense or the severity of the sentence.

 We conclude that the sentence imposed is neither grossly disproportionate to the
crime nor unconstitutionally cruel or unusual. (4) Appellant's third issue is therefore
overruled.

III. Conclusion

 Having overruled appellant's three issues, we affirm the judgment of the trial court.



 

 DORI CONTRERAS GARZA,

 Justice


Do not publish.

Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and

filed this the 22nd day of October, 2009.
1. This testimony was corroborated by Officer Jones, who overheard Sergeant Calderon asking
appellant "where the knife was," as well as appellant's response.
2. In fact, appellant appeared to make this argument in her testimony, as shown by the following
exchange:


Q. [Defense counsel] Mrs. Shropshire, did you have to get up here and testify in front of
this jury?


A. [Appellant] No, I did not. I could have pleaded the fifth.


Q. Okay. But you--you got up here and testified that you told the
truth?


A. Because I told the truth. I wanted my testimony to be heard.


Q. Okay. Well, if you wanted your testimony to be heard, there has
been some questions raised that you had a chance[--]according to
Lieutenant Hernandez[--]a chance to tell your story before?


A. Yes, sir, I did, but the counsels I had at that time would not want me
to tell my story. They wanted me to stay quiet and say I was
insane[. T]hat's why I fired them because I wanted to testify.
3. In Trevino v. State, we noted that the splintered nature of the decision in Harmelin has brought into
question "the viability and mode of application of proportionate analysis in non-death penalty cases." 174
S.W.3d 925, 928 (Tex. App.-Corpus Christi 2005, pet. ref'd) (citing McGruder v. Puckett, 954 F.2d 313,
315-16 (5th Cir. 1992)). In that case, we assumed, for purposes of appellant's argument, the viability of a
proportionality review, see id., and we do the same here.
4. Because we find that the sentence was not "grossly disproportionate" to the crime, we need not
perform a comparative evaluation of sentences imposed for other crimes in Texas or for the same crime in
other jurisdictions. See Solem v. Helm, 463 U.S. 277, 292 (1983); McGruder, 954 F.2d at 316; Mullins v.
State, 208 S.W.3d 469, 470 (Tex. App.-Texarkana 2006, no pet.). We note, however, that appellant does
not address this evaluation in her appeal, nor is there any evidence in the record pertaining to it.