COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

KERT JEROME PARKER,                                  )

                                                                              )              
No.  08-03-00173-CR

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )                
282nd District Court

THE STATE OF TEXAS,                                     )

                                                                              )             
of Dallas County, Texas

Appellee.                           )

                                                                              )               
(TC# F-0252525-KS)

                                                                              )

 

 

O
P I N I O N

 








Appellant, Kert
Jerome Parker, appeals from his convictions of evading arrest, unlawful
possession of a firearm by a felon, and aggravated robbery.[1]  A jury found Appellant guilty and assessed a
punishment of 20 years=
confinement for evading arrest, 5 years=
confinement for unlawful possession of a firearm by a felon, and 22 years= confinement for aggravated
robbery.  On appeal, Appellant raises
seven issues in which he challenges the factual sufficiency of his conviction
of aggravated robbery, the legal and factual sufficiency of his conviction of
unauthorized possession of a firearm, raises an ineffective counsel claim,
challenges the trial court=s
decision to deny his motion for new trial based on a juror mistakenly sitting
on the jury, and finally raises two jury charge errors pertaining to parole law
instructions.  We affirm.

FACTUAL
SUMMARY








On July 3, 2002,
at approximately 12:30 a.m., Lonzo Hurd stopped at the Tiger Mart located on
Lake June Road in Dallas, Texas to buy a lottery ticket.  As he left the store, a young black man of
medium height approached and started talking with him.  Mr. Hurd had parked his car on the west side
of the store, in a well-lit area.  At the
time he parked, no other car was parked beside him.  The young man continued to walk alongside Mr.
Hurd as he walked to the side of the building towards his car.  When Mr. Hurd 
walked around the side of the building, he noticed a car was parked
beside his car; and the car was parked with the rear end of the car first, so
that Mr. Hurd=s driver=s door was alongside the other vehicle=s driver=s
side rear door.  The young man talking to
Mr. Hurd got into the driver=s
side of the vehicle and as Mr. Hurd was trying to enter his vehicle, a another
man came up behind him,  put a pistol to
his head and instructed him to Adrop
out[2].@ 
This individual was later identified as the Appellant.  Mr. Hurd testified that he told the Appellant
that he did not have anything and the Appellant responded that yes, he did have
something and reached inside Mr. Hurd=s
pockets and pulled out his wallet.  While
still holding the gun to Mr. Hurd=s
head, the Appellant went through his wallet and told him to get inside his
vehicle.  The Appellant then reached into
Mr. Hurd=s vehicle
and grabbed a pack of cigarettes that were laying on the dashboard.  The Appellant then got into the front
passenger seat of his own vehicle.  Mr.
Hurd then heard the individual sitting in the backseat of the vehicle tell the
Appellant to give Mr. Hurd back his belongings and to let him go.  Appellant then threw the cigarettes at this
individual, and he in return threw the cigarettes to Mr. Hurd and the
individual driving the car reached out and handed Mr. Hurd his money, which was
only about $4.  The Appellant and the two
other men then sped off.

At this point, Mr.
Hurd had no idea what had happened to his wallet.  It was not until he put his car in reverse
that he noticed his wallet was underneath his vehicle.  Mr. Hurd picked up his wallet and drove
home.  He testified that at this point,
he was simply happy to be alive and that it was not until he pulled into the
driveway of his home that he became upset and decided that he could not just
let things go.  He immediately drove back
to the Tiger Mart, located only a few minutes from his home, and notified the
store clerk that he had been robbed and asked her to call the police.

When the police
arrived at the Tiger Mart, Mr. Hurd talked with the police for about fifteen
minutes and then went home.  According to
Officer Fangman=s
testimony, Mr. Hurd identified the three suspects in the vehicle, including the
gunman.  The gunman was described as a
black male, about 5' 6" tall, weighing about one hundred fifty pounds,
with black hair, possibly braided, no facial hair, and approximately nineteen
years old.  Mr. Hurd described the
vehicle as a four-door light colored Chevy Caprice.  Officer Fangman broadcasted this
information.  He also spoke to the store
clerk and requested the surveillance tapes and she told him that only the
manager could get those for him, so he asked her to hold those for him.  He also testified that he did not take any
materials to be fingerprinted and that he knew the store clerk well and that
she was not the type to destroy evidence.








Officer Marsh, who
was also on duty on that night, received the broadcast describing the Chevy
Caprice and its involvement in an aggravated robbery.  At approximately 1:30 a.m., he was sitting in
a parking lot completing some paperwork when he saw a Chevy Caprice matching
the broadcast description pass by.  In
accordance with the standard operating procedure, he proceeded to attempt a
traffic stop.  He started driving behind
the vehicle and radioed in to dispatch to let them know he may have located the
suspect vehicle.  He then turned the
squad car=s
emergency lights on and the Caprice stopped. 
He noticed that there was only one individual in the vehicle and that
this person appeared to be very tense and was closely watching him.  He also remembered the suspect was believed
to be armed.  Therefore, rather than
approach the vehicle, Officer Marsh opened the squad car door and ordered him
to put his hands outside the window where he could see them to ensure he was
not armed.  The Caprice suddenly took
off.  Officer Marsh then turned on his
siren and chased the car a short distance until it drove into an apartment
complex, onto the lawn, and the driver jumped out of the vehicle and started
running through the complex.  Officer
Marsh also stepped out of his vehicle and started to run after the Appellant
but lost sight of him so he radioed in an alert.

Both Officer
Castro and Officer Elliott responded to Officer Marsh=s
call regarding the speed chase.  Officer Castro
arrived first, in time to see Appellant drive the car onto the apartment
complex=s lawn
and jump out.  The officer followed the
Appellant on foot and radioed in his location and a description of Appellant=s clothing, which included that he was
wearing a red shirt.  Officer Elliott
arrived at the scene from another direction and was able to corner Appellant
with his patrol car.  He ordered
Appellant to get on the ground, handcuffed him, and placed him in the squad
car; then he drove Officer Castro and the Appellant back to where the Chevy
Caprice had been abandoned.  He then
turned over the Appellant to Officer Marsh. 









Officer Marsh also
searched the vehicle and found a revolver underneath the passenger=s front seat.  He confiscated the weapon and testified that
it had six shots in the cylinder.  

Detective Sherek,
of the Dallas Police Department, who was on call that night, was called into
the office some time between 2:30 and 3 a.m. 
He met the Appellant and following standard procedure in the
investigation of a crime, took a polaroid of him.  Detective Sherek gathered a few photographs
and created a photo lineup.  The next day,
he went to Mr. Hurd=s place
of business and showed him the photo lineup. 
Mr. Hurd picked out Appellant=s
photo even though the Appellant had a mustache and no braids.  Mr. Hurd testified that he was 99 2 percent sure that the Appellant was
the perpetrator.

Sufficiency of the Evidence

In reviewing the
legal sufficiency of the evidence, we must view the evidence in the light most
favorable to the verdict to determine whether any rational trier of fact could
have found the essential elements of the offense beyond a reasonable
doubt.  Jackson v. Virginia, 443
U.S. 307, 319, 99 S.Ct. 2781, 2788‑89, 61 L.Ed.2d 560 (1979); Lacour
v. State, 8 S.W.3d 670, 671 (Tex.Crim.App. 2000).  We do not resolve any conflict of fact, weigh
any evidence, or evaluate the credibility of any witnesses, as this was the
function of the trier of fact.  See
Adelman v. State, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); Matson v.
State, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991).  Instead, our duty is to determine whether
both the explicit and implicit findings of the trier of fact are rational by
viewing all the evidence admitted at trial in the light most favorable to the verdict.  See Adelman, 828 S.W.2d at 421‑22.  In so doing, any inconsistencies in the
evidence are resolved in favor of the verdict. 
Matson, 819 S.W.2d at 843.








In reviewing a
factual sufficiency of the evidence challenge, we consider all of the evidence
in a neutral light, both for and against the verdict, to determine whether it
demonstrates that the proof of guilt is so obviously weak as to undermine our
confidence in the jury=s
determination, or the proof of guilt, although adequate if taken alone, is
greatly outweighed by contrary proof.  Johnson
v. State, 23 S.W.3d 1, 11 (Tex.Crim.App. 2000); Clewis v. State, 922
S.W.2d 126, 134 (Tex.Crim.App. 1996).  In
conducting a factual sufficiency review, the reviewing court cannot substitute
its conclusions for those of the jury.  See
Davila v. State, 930 S.W.2d 641, 647 (Tex.App.-‑El Paso 1996, pet.
ref=d). 
Our review must employ appropriate deference and should not intrude upon
the fact finder=s role as
the sole judge of the weight and credibility given to any evidence presented at
trial.  Johnson, 23 S.W.3d at 7; Clewis,
922 S.W.2d at 134.  A jury=s verdict is not manifestly unjust
merely because the fact finder resolved conflicting views of the evidence in
favor of the State.  Cain v. State,
958 S.W.2d 404, 410 (Tex.Crim.App. 1997).

In Issue One,
Appellant challenges the factual sufficiency of the evidence to support his
conviction for aggravated robbery. 
Specifically, Appellant argues that the Adescription
of the robber is markedly different from Appellant=s
appearance.@  Mr. Hurd testified that he was focusing on
the gun not on the perpetrator.  As such,
Appellant contends that Mr. Hurd was mistaken in his identification of the
Appellant; Mr. Hurd=s
testimony regarding his identification was insufficient to warrant the
verdict.  








In this instant
case, Mr. Hurd testified that during the assault, he was primarily
concentrating on the gun but was able to see the Appellant out of the side of
his eye.  He also indicated that he would
not have identified the Appellant as being the perpetrator from the photo
lineup unless he was certain that it was him. 
He further testified that he was 99 2
percent certain that his identification was correct.  He described the perpetrator as having no
facial hair, with possibly braided hair, and being a young man about 5' 6"
tall and weighing one hundred fifty pounds. 
The Appellant, however, had no braids, had facial hair, and was more
like six feet tall, weighed about two hundred and twenty-five pounds and was
close to age thirty.

The defense also
introduced testimony of the Appellant=s
brother in-law and his girlfriend at the time, which attempted to place
Appellant at a different location during the time the alleged robbery
occurred.  Appellant=s brother-in-law, James Brown,
testified that on July 2, 2002, Appellant came over to his house to get some
clothing and use the phone.  Appellant
arrived some time between 12:10 and 12:15 a.m. and did not leave Mr. Brown=s home until 1 a.m.  Appellant=s
girlfriend at the time testified that she and the Appellant were fighting that
night and that he left to his sister=s
house and returned later that night.  She
was unable to provide a time frame, but did testify that Appellant dropped off
some clothes and then left again.  She
also testified that Appellant might have been wearing a red sleeveless shirt
that night and that he had tattoos up and down both of his arms.  Mr. Hurd, however, did not provide the police
with a description of any distinguishing marks on Appellant=s body. 
While there were obvious discrepancies between Mr. Hurd=s description of Appellant and
Appellant=s actual
appearance, these conflicts were up to the jury to resolve.  See De Los Santos v. State, 918 S.W.2d
565, 569 (Tex.App.--San Antonio 1996, no pet.).








Given all the
evidence presented at trial, a rational jury could have concluded that
Mr. Hurd=s
identification of the Appellant was accurate. 
It is the sole province of the jury to determine what weight to give
contradictory testimonial evidence since it turns on the evaluation of
credibility and demeanor.  See Cain,
958 S.W.2d at 407.  Furthermore, a
verdict is not manifestly unjust merely because the jury resolved conflicting
views of the evidence in favor of the State. 
Cain, 958 S.W.2d at 410. 
After reviewing the evidence, we find that it supports the jury=s findings that Mr. Hurd=s identification of the Appellant was
correct and not so weak as to be clearly or manifestly unjust, nor is it
contrary to the overwhelming weight of the evidence.  Issue One is overruled.

In Issue Two and
Issue Three, Appellant challenges the legal and factual sufficiency of the
evidence to support his conviction for unauthorized possession of a
firearm.  Appellant contends that the
evidence presented at trial failed to show that Appellant possessed the
gun.  Therefore, Appellant argues that no
reasonable trier of fact could have found the essential elements of the
offense.  Furthermore, taken alone, the
State=s
evidence is too weak to support the verdict and the proof of guilt is against
the great weight and preponderance of the evidence.  

Under Section
46.04 of the Texas Penal Code:

(a)        A person who has been convicted of a
felony commits an offense if he possesses a firearm: 

 

(1)        after the conviction and before the
fifth anniversary of the person=s
release from confinement following conviction of the felony or the person=s release from supervision under
community supervision, parole, or mandatory supervision, whichever date is
later; or

 

(2)        after the period described by
Subdivision (1), at any location other than the premises at which the person
lives.

 








Tex.Pen.Code
Ann. '
46.04(a)(Vernon Supp. 2004-05). 
Possession is defined by the Penal Code as Aactual
care, custody, control, or management.@  Tex.Pen.Code
Ann. '
1.07(a)(39) (Vernon Supp. 2004-05).  If
the firearm is not found on the accused=s
person or is not in the exclusive possession of the accused, the evidence must
affirmatively link the accused to the firearm. 
Davis v. State, 93 S.W.3d 664, 667 (Tex.App.--Texarkana 2002,
pet. ref=d); see
Brown v. State, 911 S.W.2d 744, 747 (Tex.Crim.App. 1995).  An affirmative link may be established
through direct or circumstantial evidence. 
Brown, 911 S.W.2d at 747. 
Some non‑exhaustive factors that may affect the determination of
an affirmative link include whether the contraband was (1) in a car driven by
the accused, (2) in a place owned by the accused, (3) conveniently accessible
to the accused, (4) in plain view, (5) found in an enclosed space, or (6) the
conduct of the accused indicated a consciousness of guilt.  Corpus v. State, 30 S.W.3d 35, 38
(Tex.App.--Houston [14th Dist.] 2000, pet. ref=d);
Gilbert v. State, 874 S.W.2d 290, 298 (Tex.App.‑-Houston [1st
Dist.] 1994, pet. ref=d).  The number of factors present is not as
important as the logical force or the degree to which the factors, alone or in
combination, tend to affirmatively link the accused to the firearm.  See Wallace v. State, 932 S.W.2d 519,
524 (Tex.App.--Tyler 1995, pet. ref=d).

It is undisputed
in this case that Appellant is a felon. 
Instead, Appellant=s
point of contention revolves around the alleged State=s
failure to prove he had possession of the firearm.  In this case, the Appellant was the driver
and sole passenger of the vehicle and the gun was readily accessible to
him.  When Officer Marsh initially
stopped the Appellant, he described him as appearing to be tense.  Appellant additionally refused to stop the
vehicle and instead took Officer Marsh on a speed chase which turned into a
foot chase.  We find that these
affirmative links were sufficient evidence to support Appellant=s conviction of possession of a
firearm.  Viewing the evidence in the
light most favorable to the verdict, a rational jury could reasonably have
concluded that Appellant possessed the firearm. 
We find the evidence to be legally sufficient.  Issue Two is overruled.








The jury was free
to infer from the testimonial evidence at trial that Appellant possessed the
gun.  The Appellant offered the testimony
of his then girlfriend in which she testified that Appellant did not own a
vehicle and that she had never seen the Chevy Caprice.  Additionally, the vehicle registration form
showed that the vehicle was not registered to the Appellant.  The jury was free to infer from this
testimony that the vehicle was not Appellant=s
and that he had no knowledge of the gun. 
They could have also inferred from the State=s
evidence that he knew about the gun and was not expecting to get caught;
therefore, he ran without attempting to hide the weapon.  After balancing the evidence supporting the
verdict against that which contradicts it, we find that the finding of guilt is
not against the great weight of the evidence. 
See Johnson, 23 S.W.3d at 11. 
We overrule Issue Three. 

Ineffective Assistance of Counsel

In Issue Four,
Appellant contends he received ineffective assistance of counsel when his trial
attorney introduced the testimony of Dallas Police Officer James Jablon,
without first interviewing him. 
Additionally, Appellant contends that his trial counsel was ineffective
when he failed to object to the trial court=s
omission of the jury instruction to disregard the testimony regarding the
extraneous offense Officer Jablon mentioned in his testimony.








In order to
establish ineffective assistance of counsel, the appellant must prove by a
preponderance of the evidence that counsel=s
representation fell below an objective standard of reasonableness based upon
prevailing professional norms, and that there is a reasonable probability that
but for counsel=s
unprofessional errors, the result of the proceeding would have been
different.  See Strickland v.
Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  A reasonable probability is defined as a
probability sufficient to undermine confidence in the outcome.  See Miniel v. State, 831 S.W.2d 310,
323 (Tex.Crim.App. 1992).  The review of
counsel=s
representation is highly deferential and we must indulge a strong presumption
that counsel=s conduct
falls within a wide range of reasonable representation.  McFarland v. State, 928 S.W.2d 482,
500 (Tex.Crim.App. 1996).  Thus, the
appellant must overcome the presumption that under the totality of the
circumstances, the challenged action might be considered trial strategy.  See Jackson v. State, 877 S.W.2d 768,
771 (Tex.Crim.App. 1994).  
Representation is not ineffective simply because, in hindsight, the
attorney could have or even should have done something differently.  Godwin v. State, 899 S.W.2d 387, 391
(Tex.App.-- Houston [14th Dist.] 1995, pet. ref=d).

In apparent
pursuit of his trial strategy, Appellant=s
counsel called to the stand Officer Jablon to testify that on the night in
question at approximately 12:30 a.m., he responded to a disturbance call on
Scyene Road.  When he arrived at the
scene, he discovered that gun shots had been fired into the convenience store
from the parking lot of the apartment complex he was called out to.  Witnesses informed Officer Jablon that the
vehicle was a late model, light-colored or white Chevy Caprice.  The vehicle had temporary dealer tags and the
security guard of the apartment complex was able to provide him with the number
from the dealer tag and an expiration date. 
However, Appellant=s
defense counsel had anticipated that Officer Jablon would testify that he did
not get the numbers of the license plate until he arrived at the scene where
Appellant was apprehended.  Upon
discovering the discrepancy, Appellant=s
defense counsel moved for a mistrial which the trial court denied.  However, the trial court did instruct the
jury to disregard Officer Jablon=s
entire testimony.








The record before
us establishes that Appellant=s
trial counsel was attempting to establish a defense strategy that on the night
in question there were two vehicles with matching descriptions in the
area.  One which was occupied by the
perpetrator and the other two suspects, and a second Caprice that Appellant was
driving.  As such, Officer Jablon=s testimony was a critical component of
defense counsel=s trial
strategy.  Appellant, however, argues
that defense counsel=s
failure to interview Officer Jablon and discover the discrepancy before calling
him to the witness stand resulted in ineffective assistance.  The record before us does not support the
conclusion that Appellant=s
trial counsel provided ineffective assistance. 
It is only in hindsight that we see that defense counsel=s strategy failed when Officer Jablon
testified to such information.  

A[C]ounsel has a duty to make reasonable
investigations or to make a reasonable decision that makes particular
investigations unnecessary.@  McFarland, 928 S.W.2d at 501, citing
Strickland, 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.  A decision not to investigate must be
directly assessed for reasonableness under all the circumstances, applying a
heavy measure of deference to counsel=s
judgments.  Id.  Defense counsel stated to the trial court
that the reason he did not investigate or interview Officer Jablon prior to
putting him on the stand was because it was not the normal practice of defense
attorneys to do this.  Furthermore,
Appellant has not shown that the result of the proceedings would have been
different if Officer Jablon=s
testimony would have not been introduced. 









Appellant further
contends that defense counsel failed to object to the trial court=s omission of the requested instruction
on the jury charge to disregard Officer Jablon=s
testimony.  Appellant argues that had
defense counsel not presented the testimony of Officer Jablon, and had the jury
not heard such testimony, the jury would have possibly not given the Appellant
the maximum sentence on the evading arrest charge nor the sentences for the
other two offenses.  However, the trial
court instructed the jury to disregard Officer Jablon=s
testimony during the trial.  In so doing,
the trial court cured any potential error. 
See Ovalle v. State, 13 S.W.3d 774, 783 (Tex.Crim.App.
2000).  The testimony was not such that
it clearly calculated to inflame or prejudice the minds of the jury and was of
such a character that the impression it created on the jury cannot be withdrawn
from the jury.  See Hinojosa v. State,
4 S.W.3d 240, 253 (Tex.Crim.App. 1999). 
We further assume that the jury followed the trial court=s instructions and did not consider
such testimony in assessing Appellant=s
punishment.  See id.

Appellant has not
met the burden of showing that there is a reasonable probability that but for the
unprofessional errors, the result of his trial would have been different.  Additionally, we will not hold that a trial
strategy that fails necessarily results in an ineffective assistance of counsel
finding.  In considering the totality of
the circumstances, the fact that Officer Jablon=s
testimony surprised defense counsel did not distract from the effectiveness of
the representation Appellant received. 
Appellant has failed to show ineffective assistance of counsel.  Issue Four is overruled.

Improper Jury Panel








In Issue Five,
Appellant argues that the trial court erred in refusing to grant his motion for
new trial after it was discovered that a panelist who was challenged for cause
actually served on the jury.  It was not
discovered until after the trial was over that Juror Osburn, who had been
challenged for cause, mistakenly served on the jury.  At the hearing on the motion for new trial,
Juror Osburn also testified that he heard his name being called as being
selected for the jury, so he went and sat in the jury box.  He testified that he did not have an
alternative motive for sitting in the jury and that it was an honest mistake.

It is undisputed
that the trial court granted the challenge for cause for Juror Osburn.  Appellant argues that the trial court did so
because it was obvious that Juror Osburn had some bias or prejudice that
prohibited him from being a qualified juror. 
As such, Appellant was harmed by having Juror Osburn sit on the jury.

Appellant,
referring to the circumstances as unusual, contends that it would have been
difficult for counsel to recall the sixty panelists summoned for jury duty and
to properly identify Juror Osburn as having been challenged for cause.  He further argues that defense counsel did
not memorize all the juror=s
faces and states that counsel=s
failure to realize that a mistaken juror had been seated should not be held
against him.

The proper time to
raise an objection to the impaneling of the jury would have been before the
panel is sworn.  See Pogue v. State,
553 S.W.2d 368, 369 (Tex.Crim.App. 1977). 
AIt is the
duty of the parties to see that as impaneled, the box does not contain a juror
who has been challenged by striking; should such a juror remain and be sworn,
the court is not obliged to discharge him and substitute another juror.  A fortiori, the verdict is not vitiated
thereby--at least unless the complainant can affirmatively show that the
unaccepted juror was prejudiced.@  Anderson v. State, 142 Tex.Crim. 384,
154 S.W.2d 482, 483 (1941).  As such, it
was the failure of defense counsel to meet his responsibility of ensuring that
there had not been a mistake in the impaneling of the jury.








We do not agree
with Appellant that he was harmed by having Juror Osburn serve on the
jury.  At the hearing on the motion for
new trial, evidence was revealed which indicated that Juror Osburn had a family
member sentenced to prison.  It is more
likely then, if anyone was harmed by him sitting on the jury, it was the
State.  Having reviewed the record, we
find no injury to the Appellant despite defense counsel=s
lack of due diligence in discovering the mistake.  As such, we overrule Issue Five.

Jury Charge Error

In Issue Six,
Appellant argues that the trial court erred in failing to provide the correct
instruction as mandated by Article 37.07, sec. 4(c) of the Code of Criminal
Procedure in the punishment charge for the unlawful possession of a firearm by
a felon.  Similarly, in Issue Seven,
Appellant contends that the trial court erred in failing to include the
complete charge as mandated by Article 37.07, sec. 4(a) of the Code of Criminal
Procedure.  








We review a charge
error utilizing a two-step process.  Orona
v. State, 52 S.W.3d 242, 249 (Tex.App.--El Paso 2001, no pet.).  We first determine whether error actually
exists in the charge.  Almanza v.
State, 686 S.W.2d 157, 171 (Tex.Crim.App. 1985)(Op. on reh=g); Orona, 52 S.W.3d at 249.  If error exists, we must then determine
whether sufficient harm was caused by the error to warrant reversal.  Arline v. State, 721 S.W.2d 348, 351
(Tex.Crim.App. 1986).  If the charge
error was the subject of timely objection, reversal is required if that error
was calculated to injure the rights of the defendant thereby causing Asome harm.@  Ovalle, 13 S.W.3d at 786.  If error exists, we must then assess whether
any resulting harm requires reversal.  Almanza,
686 S.W.2d at 171.  In a case where the
defendant did not properly object at trial, we will reverse only if the error
is so egregious and created such harm that he was denied a fair and impartial
trial.  Arline, 721 S.W.2d at 351;
Almanza, 686 S.W.2d at 171.  In
both circumstances, the harm suffered is examined in light of the entire jury
charge, the state of the evidence, including the contested issues and weight of
the probative evidence, the argument of counsel and any other relevant
information revealed by the record of the trial as a whole.  Almanza, 686 S.W.2d at 171.  

Appellant in this
case was not convicted of an offense listed in Article 42.12,
sec. 3g(a)(1), and therefore Article 37.07, sec. 4(c) mandates that the trial
court instruct the jury at punishment as follows:

Under the law
applicable in this case, the defendant, if sentenced to a term of imprisonment,
may earn time off the period of incarceration imposed through the award of good
conduct time.  Prison authorities may
award good conduct time to a prisoner who exhibits good behavior, diligence in
carrying out prison work assignments, and attempts at rehabilitation.  If a prisoner engages in misconduct, prison
authorities may also take away all or part of any good conduct time earned by
the prisoner.

It is also possible
that the length of time for which the defendant will be imprisoned might be
reduced by the award of parole.

Under the law
applicable in this case, if the defendant is sentenced to a term of imprisonment,
he will not become eligible for parole until the actual time served plus any
good conduct time earned equals one‑fourth of the sentence imposed.  Eligibility for parole does not guarantee
that parole will be granted.

It cannot accurately
be predicted how the parole law and good conduct time might be applied to this
defendant if he is sentenced to a term of imprisonment, because the application
of these laws will depend on decisions made by prison and parole authorities.

You may consider the
existence of the parole law and good conduct time. However, you are not to
consider the extent to which good conduct time may be awarded to or forfeited
by this particular defendant.  You are
not to consider the manner in which the parole law may be applied to this
particular defendant.

 

Tex.Code
Crim.Proc.Ann. art. 37.07, '
4(c)(Vernon Supp. 2004-05).

In this case, the
trial court failed to instruct the jury as mandated by Article 37.07,
sec. 4(c) and instead instructed the jury pursuant to Article 37.07, sec.
4(a).  Article 37.07, sec. 4(a) is
similar to Section 4(c) except for the following italicized language:








Under the law
applicable in this case, if the defendant is sentenced to a term of
imprisonment, he will not become eligible for parole until the actual time
served equals one‑half of the sentence imposed or 30 years, whichever
is less, without consideration of any good conduct time he may earn.  If the defendant is sentenced to a term of
less than four years, he must serve at least two years before he is eligible
for parole.  Eligibility for parole does
not guarantee that parole will be granted.

 

Tex.Code
Crim.Proc.Ann. art. 37.07, '
4(a)(Emphasis added).

Aggravated robbery
is an offense listed in Article 42.12, sec. 3g(a)(1)(F) and as such, Article
37.07, sec. 4(a) mandates the trial court to instruct the jury at punishment
with the following:

Under the law
applicable in this case, the defendant, if sentenced to a term of imprisonment,
may earn time off the period of incarceration imposed through the award of good
conduct time.  Prison authorities may
award good conduct time to a prisoner who exhibits good behavior, diligence in
carrying out prison work assignments, and attempts at rehabilitation.  If a prisoner engages in misconduct, prison
authorities may also take away all or part of any good conduct time earned by the
prisoner.

It is also possible
that the length of time for which the defendant will be imprisoned might be
reduced by the award of parole.

Under the law
applicable in this case, if the defendant is sentenced to a term of
imprisonment, he will not become eligible for parole until the actual time
served equals one‑half of the sentence imposed or 30 years, whichever is
less, without consideration of any good conduct time he may earn.  If the defendant is sentenced to a term of
less than four years, he must serve at least two years before he is eligible
for parole.  Eligibility for parole does
not guarantee that parole will be granted.

It cannot accurately
be predicted how the parole law and good conduct time might be applied to this
defendant if he is sentenced to a term of imprisonment, because the application
of these laws will depend on decisions made by prison and parole authorities.

You may consider the
existence of the parole law and good conduct time. However, you are not to
consider the extent to which good conduct time may be awarded to or forfeited
by this particular defendant.  You are
not to consider the manner in which the parole law may be applied to this
particular defendant

 

Tex.Code
Crim.Proc.Ann. art. 37.07, '
4(a).

In this case, the
trial court failed to instruct the jury as mandated by Article 37.07,
sec. 4(a) by omitting the first paragraph of the mandated instruction from
the charge.  In both instances, the
defense counsel failed to object to the court=s
charge.  








A court is
statutorily mandated to deliver to the jury a written charge distinctly setting
forth the law applicable to the case.  Tex.Code Crim.Proc.Ann. art. 36.14
(Vernon Supp. 2004).  The parole law
instruction is a Alegislatively-mandated
statement of the law appliable to the punishment phase of the trial.@ 
Luquis v. State, 72 S.W.3d 355, 363 n.18 (Tex.Crim.App. 2002); Muhammad
v. State, 830 S.W.2d 953, 955-56 (Tex.Crim.App. 1992)(parole law
instruction is Aan
instruction on the law applicable to [the] case@).  Thus, a trial court errs by failing to
include the mandatory statutory parole instruction in the jury charge.  Grigsby v. State, 833 S.W.2d 573, 576
(Tex.App.--Dallas 1992, pet. ref=d).  In both of these cases, the jury charge
provided material varied from the required instruction and therefore the charge
was erroneous.  

Having come to this conclusion, our
next step is to determine whether Appellant has suffered egreious harm.  See Almanza, 686 S.W.2d at 171.

Appellant bears
the burden of proving egregious harm and he must Apersuade
the reviewing court that he suffered some actual harm as a consequence of the
charging error.  If he is unable to do
so, the error will not result in a reversal of his conviction.@ 
Abdnor v. State, 871 S.W.2d 726, 732 (Tex.Crim.App. 1994), quoting
La Point v. State, 750 S.W.2d 180, 191 (Tex.Crim.App. 1986)(Op. on reh=g). 
The instruction is designed to increase jury sentences, and thus, favors
the State and not defendants.  Grigsby,
833 S.W.2d at 576.  The parole
instruction informs the jury how good conduct time combines with actual time
served to determine parole eligibility.  Id.  The instruction is designed to increase jury
sentences.  Id.








Appellant agrees
that he failed to object; however, he argues that the failure to include the
proper instructions and to omit the required instruction resulted in Appellant
suffering egregious harm.  Appellant does
not provide any justification for the determination that he would have received
fewer number of years as punishment if the proper instruction would have been
given. 

In this case, we
fail to see how the Appellant has suffered egregious harm by the trial court=s failure to include an instruction to
the effect that he might be released at an earlier time than his sentence would
indicate.  As the State argues, the
instruction actually was to the benefit of the Appellant because it indicated
that Appellant would have to serve one-half of his sentence imposed or thirty
years rather than just one-fourth of his sentence, calculated by including good
conduct time earned.  See Tex.Code Crim.Proc.Ann. art. 37.07, ' 4(a) and (c).  With the improper instructions given, the
jury could have only reduced Appellant=s
sentences.  We find that Appellant has
made no showing that he was deprived of a fair and impartial trial because of
the improper instructions given to the jury. 
We therefore overrule Issues Six and Seven.

Accordingly, we
affirm the trial court=s
judgment.

 

 

September
23, 2004

DAVID WELLINGTON
CHEW, Justice

 

Before Panel No. 1

Larsen, McClure, and Chew, JJ.

 

(Do Not Publish)











[1]
Appellant was charged in cause number F-0252524-KS of the second-degree felony
offense of evading arrest.  In cause
number F-0252525-KS, Appellant was charged with the third-degree felony offense
of  unlawful possession of a firearm by a
felon.  In cause number 

F-0272743-LS, Appellant was
charged with the first-degree felony offense of aggravated robbery.





[2]
The State in its opening argument defined Adrop
out@ as meaning to give me all your money.