COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS



MIGUEL ANGEL DIAZ,


 Appellant,


v.


THE STATE OF TEXAS,


 Appellee.
§


 


§


 


§


 


§


 


§


 


 § 


No. 08-07-00323-CR



Appeal from the


409th District Court


of El Paso County, Texas


(TC# 20060D02792)


O P I N I O N


 A jury convicted Appellant, Miguel Diaz, of aggravated sexual assault of a child and
indecency with a child. Appellant's punishment was assessed at fifteen and five years' confinement,
respectively. On appeal, Appellant challenges the trial court's denial of his motion to suppress his
confession and the legal and factual sufficiency of the evidence. Finding no abuse of discretion and
that the evidence was sufficient, we affirm.

BACKGROUND


 Appellant married Sandra Diaz when R.C., Diaz's daughter, was four years old. Later, at age
nine, R.C. made statements about being sexually abused to her third-grade teacher, Mirna Gonzalez,
whom R.C. liked. The statements were precipitated by a discussion on school harassment and bad
touching, which Gonzalez explained was "if somebody makes you do things you don't want to do
or makes you feel uncomfortable." When the discussion ended, R.C. told Gonzalez that she thought
some of those rules were not happening at her home. When Gonzalez asked what she meant, R.C.
told her that she felt harassed because of her stepfather, Appellant. R.C. related that when her
mother went walking or to the store and left her alone with Appellant, he would make her see or
touch his "private parts." R.C. also pointed to her breasts and vagina and told Gonzalez that
Appellant would touch her private parts. R.C. told Gonzalez that her mother knew about the sexual
abuse since the second grade and that although it stopped for a while, it was "happening right now."

 Two weeks later, on September 16, 2003, the "government" took R.C. out of school. R.C.
then spoke to a detective at the Crimes Against Children (CAC) offices. There, she admitted that
Appellant sexually abused her. Following an examination at the hospital, R.C. was taken back to
the CAC offices, where she saw her mother. At that point, R.C. did not tell her mother that the abuse
never happened. However, sometime later, R.C. told her mother that it did not happen, and when
Child Protective Services (CPS) later took R.C. from the home in March 2004, R.C. tried to tell
"everybody" that it did not happen. Between the time of the interview and when she was taken from
her home by CPS, R.C. knew everyone was sad because Appellant was gone.

 While in foster care, other kids told R.C. that she needed to cooperate by "writing things" if
she wanted to go home. R.C. did not like being in foster care, much less that she was away from her
family and friends. She wanted to see her mother and knew that the reason CPS took her away was
because of the things she said Appellant did. R.C. knew that if she wanted to go back to her mother,
she would have to say "whatever it took." However, when R.C. told CPS that it did not happen,
CPS, according to R.C., told her that if she denied that it occurred, she would never go back home. 
Believing that was a threat, R.C. returned to her original story. CPS gave her "ugly" and "mean"
looks every time R.C. tried to tell them that the abuse never occurred.

 During her testimony at trial, R.C., when questioned by the defense attorney, denied that: 
(1) Appellant touched her breasts or around her panties; (2) Appellant placed his hand inside her
shirt or pants; (3) Appellant made her touch him or showed his penis to her; or (4) Appellant "caused
anything to go in her in any way." However, R.C. admitted that she told Gonzalez that Appellant
sexually abused her by touching her inappropriately on the "top and the bottom." R.C. admitted that
"breasts" was the correct term for "top." When asked why she told Gonzalez that Appellant touched
her, R.C. testified she thought she told Gonzalez that she and Appellant were just wrestling. R.C.
did not recall any sexual encounters in the kitchen, and when asked if Appellant touched her
inappropriately while they wrestled, R.C. stated, "Well, we were just wrestling." R.C. claimed she
only told the detective that she was sexually abused because the detective "pressured" her to do so. 
 Sergeant Mario Chaides, who worked in the CAC section of the El Paso Police Department,
assisted in the investigation of the child abuse. The same day R.C. was interviewed, Chaides met
with Appellant, who arrived on his own volition at the CAC offices, to talk about the allegations. 
After being advised of his rights and waiving the same, Appellant spoke to Chaides in Spanish. 
However, when Appellant gave a written statement, Chaides wrote it in English. When Chaides
finished, the statement was translated back in Spanish, and Appellant, after having made changes
to the statement and confirming the same, was again advised of his rights, initialed each paragraph,
and signed the last page.

 Appellant's statement acknowledged that he did "bad sexual things" to R.C., that he regretted
doing those things, and that he should be punished. According to his statement, the first sexual act
occurred in February 2003, when he went to the kitchen after having sex with his wife. Wearing
only his underwear and "still a little hard,"Appellant claimed R.C. went into the kitchen, hugged
him, and then put her hand inside his underwear and touched his penis. A few days later, R.C. told
Diaz about it, and Diaz, angry, asked Appellant what happened. After telling Diaz what occurred,
he apologized.

 Appellant's written statement also detailed another sexual act that occurred when Diaz went
to the doctor in August. While watching television and playing a game with R.C., Appellant placed
his hand on R.C.'s vagina. Appellant put his hand through the side of her shorts and under her
underwear. He was not sure if he put his finger inside her vagina, noting that was not his intent. 
But Appellant did move his hand on her vagina and in doing so, got an erection. Appellant knew
it was wrong, so he stopped touching R.C. and went to the computer room to watch pornography. 
Appellant was sorry for letting R.C. touch his penis and for touching her vagina.

 At trial, Appellant denied having intentionally and knowingly penetrated R.C.'s vagina with
his finger or any other object. He also denied ever touching R.C. on the breasts or vagina, exposing
himself to R.C., or having R.C. touch his penis. However, Appellant admitted telling Chaides that
R.C. went into the kitchen, hugged him, placed her hand inside his underwear, and touched his penis,
which was still "a little hard." But he claimed it was accidental since he was wearing loose clothes. 
Appellant also admitted telling Chaides that when he and R.C. wrestled, he put his hand through the
side of R.C.'s shorts and under her underwear, and placed his finger on her vagina. According to
Appellant, he put his hand there when R.C. fell on top of him, but he denied "looking for
something." Appellant also denied telling Chaides that he had an erection at that time. Appellant
further denied telling Chaides that he was sorry for letting R.C. touch his penis and for touching her
vagina.

 However, Appellant agreed that he was advised of his rights, told he was free to leave and
not under arrest, informed of his right to contact the Mexican consulate, and given a glass of water. 
Appellant further agreed that he understood his rights and waived them. Appellant stated that he did
not speak, read, or write English, and claimed that he did not voluntarily sign the confession. He
only signed it because he was told that if he did, R.C. would be returned to Diaz. Appellant
acknowledged that his statement was translated to him in Spanish, but he denied that the translator
told him that it said he placed his finger in R.C.'s vagina and that he got an erection as a result. He
further denied that the translator told him the statement said R.C. intentionally touched his penis.DISCUSSION

Motion to Suppress

 Appellant's first three issues challenge the trial court's denial of his motion to suppress his
written confession. Appellant contends his confession was involuntary since the written statement
was transposed in English, a biased CPS worker failed to fully translate the statement to him in
Spanish, and the police coerced him to sign it.

Standard of Review

 We review the trial court's ruling on a motion to suppress for an abuse of discretion. 
Guzman v. State, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997). In so doing, we afford almost total
deference to the trial court's determination of historical facts supported by the record, especially
when the findings are based on an evaluation of credibility and demeanor, but review de novo mixed
questions of law and fact that do not turn on an evaluation of credibility and demeanor. Id. at 89;
Balentine v. State, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002). Generally, we only consider the
evidence adduced at the suppression hearing; however, where, as here, the parties relitigate the
suppression issue at the trial on the merits, we consider all the evidence, from both the pretrial
hearing and the trial, in our review of the trial court's ruling. See Gutierrez v. State, 221 S.W.3d
680, 687 (Tex. Crim. App. 2007).

Applicable Facts

 Testimony at the motion-to-suppress hearing established that Appellant agreed to speak to
Chaides about R.C.'s sexual-abuse allegations. Appellant arrived at the police station unescorted
by the police, he was not handcuffed, and he could have left if he had chosen to do so. Chaides took
Appellant to a small office that contained a desk, computer, and a couple of chairs. Appellant
primarily spoke Spanish, and although Chaides also spoke Spanish, Chaides could not write in
Spanish.

 Although Appellant was not under arrest, Chaides, reading from a card, still advised
Appellant, in Spanish, of his rights. After each right was read, Appellant placed his initials next to
that right on the card, acknowledging that he understood. In addition, Chaides advised Appellant
that he had the right to contact the Mexican Consulate. Appellant then waived his rights and gave
Chaides a statement.

 During the interview, Appellant showed concern and asked where R.C. was and when she
would return home. Chaides told Appellant that R.C. was with CPS and the police, and that she was
not in any harm; however, Chaides did not tell him her location. At the time of the interview R.C.
was undergoing a sexual-assault exam. Chaides could not remember Appellant mentioning getting
R.C. back home.

 After Appellant relayed his version of what occurred, Chaides typed the statement in English. 
As he typed, Chaides confirmed and clarified what Appellant wanted to put in his statement. They
discussed almost every line as the statement was written. When they finished, Chaides printed the
statement.

 Because Chaides could not find an officer to translate the written statement, he asked Edna
Ortega, an investigator with CPS who happened to be at the police station, to orally translate the
written statement to Appellant in Spanish. Ortega was very fluent in Spanish, which she spoke in
her home growing up and studied in grade school, high school, and college. Earlier that day, Ortega
watched R.C.'s interview through a one-way mirror, but because she needed more details, she had
not determined that Appellant committed the acts alleged at the time Chaides asked her to translate
Appellant's statement. According to Ortega, Appellant seemed calm as she translated the statement,
and he did not ask any questions or indicate that he had been threatened or promised anything. 
Chaides was present during the translation, and to his knowledge, did not believe Ortega translated
anything incorrectly. After Ortega read the statement to Appellant, he initialed the end of each
paragraph and signed the statement.

 Appellant never indicated that he wanted to stop the interview, nor did he ever ask for an
attorney. Chaides testified that he never coerced or threatened Appellant in any way and did not
make him any direct or indirect promises to obtain his statement. And in particular, Chaides denied
ever telling Appellant that R.C. would be returned to her mother as soon as he signed the statement. 
Appellant was not denied food, drink, or restroom breaks, and he appeared coherent and not under
the influence of drugs or alcohol since his answers were responsive to the questions asked. The
entire process took about an hour.

 Appellant's testimony at the suppression hearing contradicted that of Chaides'. Although
he identified the statement as his and admitted to signing the statement and the warnings, he claimed
that when he signed the statement, he did not know what it said. According to Appellant, he did not
understand Ortega's translation, alleging that she did not translate very well. Nevertheless,
Appellant signed it because he asserted that Chaides told him R.C. would be released to her mother
once he did so. According to Appellant, he did not sign the statement voluntarily, nor did he
understand the contents of what he signed.

 In denying the motion to suppress, the trial court found that Appellant was given proper
Miranda (1) warnings prior to the interview and that although Appellant's statement was written in
English, it was orally translated into Spanish before he signed it by a native Spanish-speaker, whose
first language was Spanish. In addition, the trial court found that the statement contained the
requisite warnings under article 38.22, and that Appellant knowingly and voluntarily waived those
rights. Finally, the trial court found that the statement was given without coercion or threats, and
that the law was complied with whether Appellant was in custody when the statement was given. 

Application of the Law to the Facts

 As noted before, Appellant's first three issues complain of the trial court's denial of his
motion to suppress on grounds that his statement was involuntary. His first issue complains of the
statement being transcribed in English despite the interview occurring in Spanish, his second issue
contends that Ortega was a biased state agent, prosecuting the case against him, and thus her
translating services should not have been utilized, and his third issue asserts that his confession was
coerced. Finding the statement was not a product of custodial interrogation and was given freely and
voluntarily, we hold the trial court properly denied his motion to suppress the same.

 Whether Appellant's statement was voluntary is only an issue if the statement was the result
of custodial interrogation. Rodriguez v. State, 939 S.W.2d 211, 215 (Tex. App.-Austin 1997, no
pet.); Morris v. State, 897 S.W.2d 528, 531 (Tex. App.-El Paso 1995, no pet.); Holland v. State, 770
S.W.2d 56, 58 (Tex. App.-Austin 1989), aff'd, 802 S.W.2d 696 (Tex. Crim. App. 1991). A person
is "in custody" if, under the circumstances, a reasonable person would believe his freedom of
movement was restrained to the degree associated with a formal arrest. Stansbury v. California, 511
U.S. 318, 322-24, 114 S.Ct. 1526, 1528-30, 128 L.Ed.2d 293 (1994); Dowthitt v. State, 931 S.W.2d
244, 254 (Tex. Crim. App. 1996). We determine custody based on objective circumstances, and any
subjective intent of law enforcement officers to arrest is irrelevant unless that intent is communicated
or otherwise manifested to the suspect. Stansbury, 511 U.S. at 325-26. While stationhouse
questioning does not, in and of itself, constitute custody, California v. Beheler, 463 U.S. 1121,
1124-25, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); Dowthitt, 931 S.W.2d at 255, police conduct
during the questioning may cause a consensual inquiry to escalate into custodial interrogation. 
Ussery v. State, 651 S.W.2d 767, 770 (Tex. Crim. App. 1983); Bradley v. State, 960 S.W.2d 791,
801 (Tex. App.-El Paso 1997, pet. ref'd).

 Texas courts have identified four general situations which may constitute custody: (1) when
the suspect is physically deprived of his freedom of action in a significant way; (2) when a law-enforcement official tells a suspect he cannot leave; (3) when law-enforcement officers create a
situation that would lead a reasonable person to believe that his freedom of movement has been
significantly restricted; and (4) if there is probable cause to arrest and law-enforcement officials do
not tell the suspect that he may leave. Dowthitt, 931 S.W.2d at 255, citing Shiflet v. State, 732
S.W.2d 622, 629 (Tex. Crim. App. 1985). The restraint upon freedom in the first three situations
must be equivalent with that associated with an arrest as opposed to an investigative detention. See
Dowthitt, 931 S.W.2d at 255. In the fourth, the officer's knowledge of probable cause must be
manifested to the suspect, and such manifestation, considered in the totality of the circumstances,
must lead a reasonable person to believe he is not free to leave. Id.

 We have outlined the testimony presented at the suppression hearing above, and nothing
presented to the trial court demonstrates that Appellant was in custody at the time his statement was
given. The record reflects that Appellant arrived at the CAC offices on his own volition, agreed to
speak to Chaides, and was advised that he was free to leave and not under arrest, and of his rights. 
 Appellant understood his rights and chose to waive them. He was never handcuffed, and Chaides
testified that Appellant was never coerced or threatened, nor were promises made to get him to
confess. Appellant was not denied food, water, or bathroom breaks, and he was advised of his rights
again prior to signing his statement. The entire process only lasted about one hour. See, e.g.,
Houston v. State, 185 S.W.3d 917, 921 (Tex. App.-Austin 2006, pet. ref'd) (determining appellant
was not in custody after he had voluntarily gone to police station, and "the detectives specifically
told [him] that he was not under arrest and implied through their questioning that he could leave");
Garcia v. State, 106 S.W.3d 854, 858-59 (Tex. App.-Houston [1st Dist.] 2003, pet. ref'd)
(concluding no custody when suspect voluntarily went to the police department, and after he was told
that he could leave, he voluntarily gave a videotaped statement); Garza v. State, 34 S.W.3d 591,
596-98 (Tex. App.-San Antonio 2000, pet. ref'd) (discussing significance of fact that suspect told
he was free to leave in case in which court ultimately determined that interview was not custodial). 
Finding Appellant not in custody when he made his statement, Appellant cannot now argue that his
confession was involuntary. Rodriguez, 939 S.W.2d at 215; Morris, 897 S.W.2d at 531; Holland,
770 S.W.2d at 58. Nevertheless, in the interest of justice, we will assume Appellant was in custody
and address his specific contentions.

Transcription in English

 Appellant first contends that his statement was involuntary and violated his due-process
rights when despite the interview taking place in Spanish, his statement was transcribed in English. 
According to Appellant, the statement should have been transcribed in Spanish so that he could read
and understand what he signed. However, a statement that is given orally in Spanish, interpreted by
an officer, and written down in English is not per se inadmissible. See Montoya v. State, 810 S.W.2d
160, 173-74 (Tex. Crim. App. 1989), cert. denied, 502 U.S. 961, 112 S.Ct. 426, 116 L.Ed.2d 446
(1991). Indeed, the law does not require that a confession be in the accused's language. See Bell
v. State, 724 S.W.2d 780, 793 (Tex. Crim. App. 1986), cert. denied, 479 U.S. 1046, 107 S.Ct. 910,
93 L.Ed.2d 860 (1987). As noted by the Houston Court of Appeals, "[m]erely because appellant's
statement was translated into English and typed . . . does not negate its voluntariness." Campos v.
State, No. 14-94-00971-CR, 1998 WL 78055, at *3 (Tex. App.-Houston [14th Dist.] Feb. 26, 1998,
no pet.) (op., not designated for publication). The determination of whether a confession is voluntary
is based on an examination of the totality of the circumstances surrounding its acquisition. Reed v.
State, 59 S.W.3d 278, 281 (Tex. App.-Fort Worth 2001, pet. ref'd).

 Here, nothing in the record suggests that Appellant's statement was not voluntary. He went
to the CAC offices on his own volition and agreed to speak to Chaides. He was told that he was not
in custody, and Appellant was never placed in handcuffs. Despite this, Chaides cautiously chose to
advise Appellant of his rights, and Appellant indicated he understood them and chose to waive them. 
Appellant was provided with water and told he was free to leave. As Appellant confessed, he
clarified what he wanted to include in his statement. Prior to signing his statement, Ortega, a fluent
Spanish speaker, translated it back into Spanish, and Appellant was again advised of his rights. 
Based on the totality of the circumstances surrounding the confession, the record clearly supports
the trial court's finding that Appellant's confession was freely and voluntarily made, and the simple
fact that Appellant's written statement was transcribed in English is insufficient to render his
confession involuntary. See Perez v. State, No. 2-03-227-CR, 2004 WL 2914294, at *3 (Tex.
App.-Fort Worth Dec. 16, 2004, pet. ref'd) (mem. op., not designated for publication); Molina v.
State, No. 07-03-0186-CR, 2004 WL 2746608, at *3 (Tex. App.-Amarillo Dec. 1, 2004, no pet.)
(op., not designated for publication) (cases holding, based on totality of circumstances, that statement
was voluntary despite it being written in a different language). We overrule Appellant's first issue.

Translation

 Appellant's second contention alleges that Ortega was biased, "prosecuting" the case against
him, and that she failed to correctly translate the statement. Appellant argues she "had a motive for
seeing that [his] statement was as incriminating as possible." Thus, Appellant contends his statement
was involuntary and that admission of the same violated his rights to due process. The State
disagrees.

 Both Appellant and the State cite United States v. Nazemian, 948 F.2d 522, 527 (9th Cir.
1991), cert. denied, 506 U.S. 835, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992), as the appropriate test in
determining whether Ortega was biased. Although Nazemian and its progeny concern the "language
conduit" rule, whereby a translated statement of a defendant is admissible on the theory that the
interpreter serves as an agent of, or a language conduit for, the declarant-defendant, thus rendering
the statement not hearsay, but the defendant's own admission, we find guidance in the four-part test
in determining Ortega's bias. (2) Id.; United States v. Koskerides, 877 F.2d 1129, 1135 (2nd Cir.
1989); United States v. Cordero, 18 F.3d 1248, 1253 (5th Cir. 1994); Saavedra v. State, 297 S.W.3d
342, 348 (Tex. Crim. App. 2009); Cassidy v. State, 149 S.W.3d 712, 715-16 (Tex. App.-Austin
2004, pet. ref'd), abrogated on other grounds by Wall v. State, 184 S.W.3d 730 (Tex. Crim. App.
2006); Gomez v. State, 49 S.W.3d 456, 459-61 (Tex. App.-Houston [1st Dist.] 2001, pet. ref'd). 
Those four factors include: (1) which party supplied the interpreter; (2) whether the interpreter had
any motive to mislead or to distort; (3) the interpreter's qualifications and language skill; and (4)
whether actions taken subsequent to the conversation were consistent with the statements as
translated. Gomez, 49 S.W.3d at 459.

 Here, we find neither party supplied the interpreter. The record reflects that the interview
began at 5:40 p.m., and Appellant signed his statement at 6:50 p.m. Because of the late hour, the
civilian and uniformed staff at the station had gone home. Chaides testified that when he finished
taking Appellant's statement, he called the regional command center and asked them to send
someone to read the statement to Appellant in Spanish. The officer sent, however, was unable to
speak Spanish. The only person available that could read and speak Spanish, and translate
Appellant's statement from English to Spanish was Ortega. Ortega simply happened to be at the
police station after talking with Diaz when Chaides asked if anyone could translate.

 We also find that there was no evidence that Ortega was biased or had any reason to mislead
Appellant as to what the written statement contained. Appellant claims that Ortega was involved
in prosecuting the case against him to suggest bias. However, although law enforcement's job is to
ferret out crime, investigate its commission, arrest the perpetrator, and gather evidence for a possible
prosecution, CPS workers have a different duty - to protect the welfare and safety of children in the
community - by finding safe housing. Wilkerson v. State, 173 S.W.3d 521, 527, 529 (Tex. Crim.
App. 2005). Nevertheless, sometimes these paths cross, and we must examine the entire record to
determine if they have converged in this case. Id. at 530.

 Ortega testified generally that CPS's job is to protect the children, and that while police are
investigating a criminal case, CPS conducts its own civil investigation. Although Ortega observed
R.C.'s interview prior to translating Appellant's statement, she explicitly testified that she had not
made up her mind whether any abuse had occurred or whether Appellant was guilty of anything. She
had not yet spoken to Appellant, and after she translated the statement, CPS transferred the case to
"COP" for services with that department and Ortega was no longer involved in the case. Chaides,
who could speak Spanish, was present when Ortega translated the statement, and to his knowledge,
he did not believe Ortega translated anything incorrectly. The trial court, viewing Chaides' and
Ortega's demeanor on the stand, could have readily chosen to believe Ortega's lack of biasness at
the time she translated the statement. See Green v. State, 934 S.W.2d 92, 98 (Tex. Crim. App. 1996)
(at a suppression hearing, the trial judge is the "sole and exclusive trier of fact and judge of the
credibility of the witnesses as well as the weight to be given their testimony. The trial judge may
choose to believe or disbelieve any or all of a witness' testimony"). We find nothing in the record
to suggest that Ortega was motivated to translate the statement incorrectly or did translate the
statement incorrectly.

 We also find Ortega was well-qualified to translate the statement and that the actions taken
by Appellant after the statement was read indicated that he understood and agreed with the statement. 
Ortega's background demonstrated that Spanish was her first language, spoken fluently in her
household. She took Spanish in grade school, high school, and in college. Moreover, Ortega felt
comfortable translating the statement from English to Spanish. When Ortega finished translating
the statement, Appellant initialed each paragraph and signed the statement. Although Appellant
testified that he did not understand Ortega's translation, nor did she translate well, the trial court, as
the sole judge of credibility, could have chosen to disbelieve Appellant's assertion. See Green, 934
S.W.2d at 98.

 After reviewing the entire record, we cannot agree with Appellant that his statement was
involuntary simply because Ortega, whom he alleges was a biased "prosecutor," translated his
statement from English to Spanish. Having determined that neither party supplied the interpreter,
the interpreter had no motive to mislead or to distort the written statement, the interpreter was skilled
in translating documents in English to Spanish, and that actions taken subsequent to the conversation
were consistent with Appellant's understanding of and agreeing with the statement, we refuse to find
that using Ortega to translate his confession rendered the same involuntary. Accordingly, the trial
court did not abuse its discretion by denying the motion to suppress his written statement on such
grounds, and we overrule Appellant's second issue.

Coercion

 Appellant's third issue contends that his statement was coerced. Only freely and voluntarily
statements made without compulsion or persuasion may be used in evidence. Tex. Code Crim.
Proc. Ann. art. 38.21 (Vernon 2005). A confession is involuntary if circumstances show that the
defendant's will was "overborne" by police coercion. Creager v. State, 952 S.W.2d 852, 856 (Tex.
Crim. App. 1997). In other words, a statement is involuntary if the record reflects "official, coercive
conduct of such a nature" that any statement obtained thereby is "unlikely to have been the product
of an essentially free and unconstrained choice by its maker." Alvarado v. State, 912 S.W.2d 199,
211 (Tex. Crim. App. 1995). Further, a statement is involuntary and inadmissible if it is induced by
a promise that is of some benefit to a defendant, is positive, made or sanctioned by someone in
authority, and of such a character as would likely influence the defendant to speak untruthfully. See
Muniz v. State, 851 S.W.2d 238, 254 (Tex. Crim. App.), cert. denied, 510 U.S. 837, 114 S.Ct. 116,
126 L.Ed.2d 82 (1993).

 Appellant asserts that he only confessed and signed the written statement because Chaides
promised him that if he did so, R.C. would be returned to Diaz. However, Chaides denied ever
telling Appellant that R.C. would be returned to her mother as soon as he signed the statement, and
the trial court found that Appellant's statement was given without coercion or threats. We defer to
the trial court's assessment of historical fact, noting that it was free to believe Chaides' testimony
that he did not make the alleged promise to Appellant. See Johnson v. State, 68 S.W.3d 644, 652-53
(Tex. Crim. App. 2002). We further note that the record demonstrates that Appellant was read his
rights before the interview and before signing the confession, and freely and voluntarily waived those
rights. Thus, giving almost total deference to the trial court's determination of historical facts based
on credibility of the witnesses, we do not find any evidence of coercion. See Johnson, 68 S.W.3d
at 652-53; Guzman, 955 S.W.2d at 88-89. Accordingly, the trial court did not abuse its discretion
by overruling Appellant's motion to suppress his written statement on coercive grounds, and we
overrule Issue Three.

Sufficiency of the Evidence

 Appellant's remaining issues contend the evidence was insufficient to support his convictions
for aggravated sexual assault of a child and indecency with a child. In analyzing the legal sufficiency
of the evidence, we review the evidence in the light most favorable to the verdict to determine
whether any rational trier of fact could have found the essential elements of the offense beyond a
reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d
560 (1979). In a factual-sufficiency analysis, we consider all of the evidence in a neutral light, and
may only find the evidence insufficient if: (1) the evidence supporting the verdict is so weak that
the verdict seems clearly wrong and manifestly unjust; or (2) the evidence supporting the verdict is
outweighed by the great weight and preponderance of contrary evidence, rendering the verdict clearly
wrong and manifestly unjust. Roberts v. State, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007).

 During our review, we remain mindful that jurors may draw reasonable inferences from basic
to ultimate facts. Matson v. State, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991). We may not hold
the jury's verdict manifestly unjust merely because it resolved conflicting views of the evidence in
favor of the State. Cain v. State, 958 S.W.2d 404, 410 (Tex. Crim. App. 1997). We further give due
deference to the jury's role as the sole judge of the weight and credibility given to any evidence
presented at trial. See Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); Davila v. State, 930
S.W.2d 641, 647 (Tex. App.-El Paso 1996, pet. ref'd).

Aggravated Sexual Assault of a Child

 In his fourth issue, Appellant contends the evidence is legally insufficient to support his
conviction for aggravated sexual assault of a child, and in his fifth issue, Appellant challenges the
factual sufficiency of the evidence to support that conviction. . Specifically, Appellant contends that
the evidence was insufficient to prove beyond a reasonable doubt that he penetrated R.C.'s vagina. 
 The indictment alleged that Appellant intentionally and knowingly caused the penetration
of the sexual organ of R.C., a child younger than 14 years of age, by means of his finger. A person
commits the offense of aggravated sexual assault of a child if he intentionally or knowingly causes
the penetration of the child's sexual organ by any means, and the child is younger than fourteen years
of age. Tex. Penal Code Ann. § 22.021(a)(1)(B)(i), (a)(2)(B) (Vernon Supp. 2009). To meet the
requirements of the statute, the State is not required to prove penetration of the vaginal canal. 
Vernon v. State, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992). Rather, penetration occurs so long
as contact with the female sexual organ could reasonably be regarded by an ordinary person as more
intrusive than contact with the outer vaginal lips. Id. "Female sexual organ" is a more general term
than "vagina" and refers to the entire female genitalia, including both vagina and the vulva. Aylor
v. State, 727 S.W.2d 727, 729-30 (Tex. App.-Austin 1987, pet. ref'd). Penetration may be proven
by circumstantial evidence, and there is no requirement that the child victim be able to testify as to
penetration. Villalon v. State, 791 S.W.2d 130, 133-34 (Tex. Crim. App. 1990). Evidence of the
slightest penetration is sufficient. Vernon, 841 S.W.2d at 409.

 Here, Gonzalez testified that R.C. told her Appellant touched her private parts and she
pointed to her vagina. Also, Appellant confessed that he put his hand through the side of R.C.'s
shorts and under her panties, and onto R.C.'s vagina. He further stated that he moved his hand on
R.C.'s vagina "a little," and in doing so, he got an erection. Appellant also confessed that he did
"bad sexual things" to R.C., that he knew it was wrong, that he was sorry for "touching her vagina,"
and that he wished he never did those things to R.C., indicating a consciousness of guilt. We find
from this evidence the jury could have reasonably inferred slight penetration. See Bucknell v. State,
Nos. 05-05-00114-CR, 05-05-00115-CR, 2007 WL 2183059, at *3 (Tex. App.-Dallas July 31, 2007,
pet. ref'd) (op., not designated for publication) (finding evidence sufficient to support penetration
when victim testified that defendant touched and rubbed with his finger her private part); Monreal
v. State, No. 14-04-00528-CR, 2006 WL 220857, at *3 (Tex. App.-Houston [14th Dist.] Jan. 31,
2006, no pet.) (mem. op., not designated for publication) (finding evidence sufficient to support
penetration when mom testified victim told her defendant, using his finger, touched "her parts");
Rivera v. State, No. 03-99-00079-CR, 1999 WL 996905, at *2 (Tex. App.-Austin Nov. 4, 1999, no
pet.) (op., not designated for publication) (finding evidence sufficient to support penetration when
victim testified that defendant did not "go inside" her with his penis but that he laid on top of her
with his penis rubbing her female sexual organ and then held her on top of him while his penis
rubbed her sexual organ).

 Although R.C. denied at trial that Appellant touched her inappropriately, she admitted that
she made those allegations to her teacher and to a detective, and that she had not at any time told
them that her claims were untrue. She claimed that she did not retract her story because CPS
pressured her and told her she could not go home unless she said what they wanted her to say. The
jury could have reasonably inferred from R.C.'s testimony that she was motivated to deny her earlier
allegations because she regretted the consequences of making them, that is, that Appellant was
missed by her family and she was placed in foster care. As the sole judge of the credibility of
witnesses, the jury was free to believe Gonzalez's testimony and accept Appellant's confession as
true, and to disbelieve Appellant's contrary testimony and R.C.'s recantation. See Chambers v.
State, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) (holding fact finder free to disbelieve
complainant's trial recantation of earlier statements and that earlier statements were sufficient to
support guilty verdict); see also Cain, 958 S.W.2d at 410; Davila, 930 S.W.2d at 647.

 Considering the evidence in a light most favorable to the verdict, we find the evidence legally
sufficient to support the jury's determination that Appellant penetrated her sexual organ. Jackson,
443 U.S. at 319. Further, viewing the evidence in a neutral light, we hold the evidence factually
sufficient to support penetration beyond a reasonable doubt. Roberts, 220 S.W.3d at 524. 
Accordingly, Issues Four and Five are overruled.

Indecency with a Child

 Appellant's sixth issue challenges the legal sufficiency of the evidence to support his
conviction for indecency with a child, and his seventh issue asserts that the evidence was factually
insufficient. A person commits the offense of indecency with a child if, with a child younger than
17 years and not the person's spouse, he engages in sexual contact with the child or causes the child
to engage in sexual contact. Tex. Penal Code Ann. § 21.11(a)(1) (Vernon 2003). "Sexual contact"
means any touching, including touching through clothing, of the breast, or any part of the genitals
of the child if committed with the intent to arouse or gratify the sexual desire of any person. Tex.
Penal Code Ann. § 21.11(c)(1) (Vernon Supp. 2009). The specific intent to arouse or gratify the
sexual desire of a person can be inferred from a defendant's conduct, remarks, or all the surrounding
circumstances. See McKenzie v. State, 617 S.W.2d 211, 216 (Tex. Crim. App. [Panel Op.] 1981);
Navarro v. State, 241 S.W.3d 77, 79 (Tex. App.-Houston [1st Dist.] 2007, pet. ref'd).

 Gonzalez testified that R.C. told her that when her mother would take a walk or go to the
store, Appellant would make her see, touch, or feel his private parts. R.C. told Gonzalez that "it"
stopped for a while but started happening again. Moreover, Appellant confessed that one night when
he went into the kitchen in his underwear, R.C. also went into the kitchen, hugged him, and put her
hand inside his shorts and touched his penis. Although R.C. recanted her statements to Gonzalez
and the detective at trial, and although Appellant testified that R.C. accidentally touched his penis
on that fateful night in the kitchen, the jury was entitled to believe R.C.'s earlier statements to
Gonzalez and the detective, and to disbelieve her recantation and Appellant's testimony. See
Chambers, 805 S.W.2d at 461.

 Given due deference to the jury's role as fact finder, we find the evidence legally sufficient
to support Appellant's conviction for indecency with a child. Jackson, 443 U.S. at 319. Further,
after reviewing all the evidence in a neutral light, we do not find the jury's verdict clearly wrong or
manifestly unjust; thus, we hold the evidence factually sufficient to support Appellant's conviction. 
Roberts, 220 S.W.3d at 524. Therefore, Appellant's final two issues are overruled.

CONCLUSION

 Having overruled Appellant's issues, we affirm the trial court's judgment.


 GUADALUPE RIVERA, Justice


January 13, 2010


Before Chew, C.J., McClure, and Rivera, JJ.


(Do Not Publish)

1. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
2. No hearsay objection was made in the trial court, and Ortega did not testify to the exact words she used in
translating the statement. Rather, she simply stated that she translated the statement from English to Spanish.